893 A.2d 1018

**Jamaal Kenneth ABEOKUTO**

v.

**STATE of Maryland.**

**No. 129, Sept. Term, 2004.**

Court of Appeals of Maryland.

Feb. 13, 2006.

Reconsideration Denied April 7, 2006.

290

Michael R. Braudes, Asst. Public Defenders (Nancy S. Forster, Public Defender, and Allison E. Pierce and Brian L. Zavin, Asst. Public Defenders, on brief), Baltimore, for appellant.

Annabelle L. Lisic, Asst. Attorney General (J. Joseph Curran, Jr., Attorney general of Maryland, and Edward J. Kelley, Asst. Attorney General, on brief), Baltimore, for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

In this direct appeal by Jamaal Kenneth Abeokuto (Appellant) of his conviction by the Circuit Court for Baltimore County for first-degree murder (and other crimes) and the

resultant primary sentence of death, we are asked to consider the following questions:

1. Did the trial court err in determining that Appellant's waiver of his constitutional right to a trial by jury at the guilt/innocence phase was knowing and voluntary?

2. Did the trial court err in admitting evidence of Appellant's post-arrest and post-*Miranda*[1] warning silence?

3. Did the trial court err when it denied Appellant's requests for continuance to permit new counsel to prepare for trial and the sentencing hearing?

4. Did the suppression court err when it denied Appellant's motion to suppress his statement, given without a *Miranda* warning, at the Homicide Unit?

5. Did the suppression court err when it denied Appellant's motion to suppress his clothing taken by police while he was at the Homicide Unit?

6. Did the suppression court err when it determined that the issuance of the warrant to search Appellant's car was supported by probable cause?

7. Did the trial court err in accepting Appellant's sentencing jury waiver?

8. Did the trial court illegally increase Appellant's sentence for extortion?

9. Did the trial court err in admitting into evidence at the sentencing hearing the testimony of a medical expert when he opined that Appellant had lied about symptoms of psychosis?

10. Did the trial court err in admitting victim's impact testimony by the victim's family members?

11. Should Appellant's death sentence be reversed as a result of the prosecutor's closing argument at the sentencing hearing when he stated that the trial court proceeding would not be the final proceeding?

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

12. Did the trial court err in imposing separate sentences for kidnapping and child kidnapping?

13. Did the trial court err if it in fact found as separate aggravating circumstances that the victim was taken in the course of an abduction or kidnapping and that the victim was a child abducted in violation of § 3–503(a)(1) of the Criminal Law Article?

14. Did the trial court err in admitting into evidence at the sentencing hearing a handgun recovered from Appellant's car?

15. Did the cumulative effect of the alleged errors deprive Appellant of a fair trial and/or a fair sentencing hearing?

16. Should the failure of the indictment to allege principalship and aggravating circumstances have precluded the imposition of a sentence of death?

17. Is the Maryland death penalty statute unconstitutional because it requires that aggravating circumstances outweigh mitigating circumstances only by a preponderance of the evidence?

## I.

### A.

Appellant, Jamaal Kenneth Abeokuto, was found guilty, following a bench trial in the Circuit Court for Baltimore County, of: first-degree murder, first-degree assault, kidnapping, and child kidnapping of his girlfriend's eight-year old daughter, Marciana Monyai Ringo; extortion; and, wearing or carrying a dangerous weapon openly with the intent to injure. According to the State's evidence at trial, Abeokuto abducted Marciana on 3 December 2002, took her to a wooded area in Harford County, and killed her by slitting her throat and kicking her head.

After charging in Harford County, the Circuit Court for Harford County granted Appellant's request for a change of venue, citing pre-trial publicity in Harford County, and transferred the case to the Circuit Court for Baltimore County.

Appellant separately elected to waive both his right to trial by jury and sentencing by jury. Accordingly, he was tried and, after being found guilty, sentenced by the court. On 15 November 2004, the court sentenced him in open court as follows: death for the murder conviction; merged for sentencing purposes the first degree assault count with the murder count; ten years of incarceration, to be served from the initial date of Appellant's arrest (24 December 2002), for the extortion conviction; thirty years of imprisonment for the kidnapping conviction, consecutive to the sentence for extortion; three years for the deadly weapon conviction, to be served consecutive to the extortion and kidnapping sentences; and twenty years to be served for child kidnapping, to run concurrently with the sentences for the extortion, kidnapping, and deadly weapon convictions. At the sentencing hearing, the court stated, as to the sentence for murder, that it found two statutory aggravating circumstances proved beyond a reasonable doubt, kidnapping and child kidnapping. The court found as a mitigator, by a preponderance of the evidence, that Appellant had not been found guilty previously of a crime of violence. Penultimately, the court determined that the State had proven beyond a preponderance of the evidence that the aggravating circumstances outweighed the mitigating circumstances. It therefore imposed the sentence of death for Marciana's murder.

In the trial judge's required Post–Sentencing Report, he stated that, although he found at the sentencing proceeding two aggravating circumstances, kidnapping and child kidnapping, he "wish[ed] to clarify that although the evidence names [sic] Kidnapping and Child Kidnapping, the Court considered one Kidnapping as the aggravating circumstance." The sentence of ten years for the extortion conviction was later amended in the Commitment Report and the Trial Judge's Post–Sentencing Report to reflect that it was to be served consecutive to the sentence for the murder conviction.

### B.

The State's evidence presented at the suppression hearings

on 12 and 13 November 2003 [2] revealed the following facts:

At approximately 4:45 p.m. on 3 December 2002, Officer Joseph Petryszak of the Baltimore City Police Department responded to 5300 Leith Road, Apartment C, because he received a report that Marciana was missing. When he arrived at the apartment, he found Marciana's parents, Milagro White and Marc Ringo, Sr., present.[3] Officer Petryszak called Appellant, who, at the time was attending class at a commercial truck driving school, and requested that he come to the apartment. Appellant agreed to the request and drove himself there. When he arrived, Officer Petryszak and two other officers questioned Appellant for about five minutes in the stairwell in front of the apartment. In response to Officer Petryszak's questions, Appellant told him that Marciana had walked to school around 7:30 a.m., came back around 7:35 a.m., and said that she needed her homework signed. While signing her homework he noticed a note about a field trip. Appellant then said that he drove her back to school, which, Officer Petryszak noted, was just across the street from the apartment. Appellant further explained that he dropped her off by the school's front doors, noticed a yellow school bus parked there with teachers and students around it, and then, without waiting to see whether Marciana went inside the school, drove through the alley at the 5200 block of Loch Raven Boulevard on his way to work.

---

**2.** Appellant sought to suppress all of the statements that he gave to police between 3:42 a.m. and 5:10 a.m. on 4 December 2002, which were obtained by the police before giving Appellant any *Miranda* warning, contending that the statements were made during the course of a custodial interrogation. The statement sought to be suppressed was admitted as evidence at trial. Appellant gave two subsequent statements at the Homicide Unit, which were obtained after giving Appellant *Miranda* warnings. The State did not offer these two statements as evidence at trial, nor does the record reveal the contents of those statements.

**3.** Marciana and her younger brother, Marc Ringo, Jr. lived with Ms. White in an apartment in Baltimore City. Ms. White was separated from the children's father, Mr. Ringo. At the time of the murder, Ms. White was involved in a romantic relationship with Appellant.

After this initial questioning, Officer Petryszak and Appellant entered the apartment. Twenty minutes later, a sergeant at the scene asked Appellant to come back out to the hallway outside of the apartment to speak with him and Officer Petryszak because of the noise in the apartment. Appellant obliged and was again cooperative. Appellant repeated his earlier statements. Meanwhile, the sergeant and officers coordinated a search for Marciana and canvassed the apartment complex. No *Miranda* warnings were given to Appellant at that time.

Detective Timothy Rabbit of the Missing Persons Unit of the Baltimore City Police Department asked Officer Petryszak to transport Appellant, Ms. White, and Mr. Ringo to his unit. Officer Petryszak advised Appellant that the detectives at the Missing Persons Unit wanted to talk with him to gather more information. Appellant said okay and was again cooperative. At about 8:00 p.m., Appellant, Ms. White and Mr. Ringo were transported separately to the Missing Persons Unit (about 15 minutes away) in marked police cars. Appellant fell asleep on the way. Ms. Constance Greene, a neighbor, also came to the Missing Persons Unit to be interviewed.

When they arrived, Officer Petryszak escorted Appellant to Detective Rabbit, who interviewed him in a small interview room. The door was shut and no officers waited outside. Appellant repeated what he had told Officer Petryszak, and also stated that he arrived at work that morning at 8:00 a.m. Detective Rabbit described Appellant as without emotion, not upset, "very low key," and cooperative. After the interview, Appellant was escorted to one of the unit's other interview rooms to wait while Detective Rabbit interviewed Ms. White, Mr. Ringo, and Ms. Greene.[4] These interviews took place in Detective Rabbit's office cubicle. Mr. Ringo told Detective Rabbit that he usually saw Marciana in the 7:30 to 7:45 a.m. time frame, but he did not that morning when he came to pick up Marc, Jr. The door to the interview room where Appellant

---

**4.** Ms. Greene told police that she saw Marciana get into Appellant's car at 8:05 a.m. that morning.

waited alone following his interview was closed and locked. Detective Rabbit explained that Appellant was secured in the room for his own safety.

Appellant then was transported by a marked police car to the Homicide Unit of the Baltimore City Police Department between 10:30 and 11:00 p.m. on 3 December 2002. Detective Rabbit called the Homicide Unit to become involved because he was alarmed that Marciana may have been kidnapped or abducted. The detective also became suspicious of Appellant because of his demeanor, statements, criminal record, and factual discrepancies between his and Ms. Greene's statements. Ms. White and Mr. Ringo were driven to the Homicide Unit by Ms. White's father.

The officers and Appellant arrived at the Homicide Unit at about 11:20 p.m. Appellant was escorted to an interview room where he remained for the evening, except when he was interviewed elsewhere in the offices or went to the bathroom; on those latter occasions, he was escorted according to normal police practices. The door to the interview room remained open. After first interviewing Ms. White and Ms. Greene, Detectives Keith Hagan and Robert Patton interviewed Appellant in a sergeant's office. The interview began at 3:42 a.m. and ended at 5:10 a.m. on 4 December 2002. The interview was tape recorded and a transcript created. Appellant was not given *Miranda* warnings prior to making these statements. Appellant recounted his previous statements that Marciana went to school at 7:30 a.m. on 3 December 2002, Marc, Jr. walked to Mr. Ringo's car at 7:40 a.m., and that, as Appellant was leaving the apartment to go to work, Marciana came back and said that she needed her homework signed. He said that he signed her homework, told her that he would drive her to school, and then did so within a span of two minutes. Appellant stated that he "carried ... [Marciana's] bookbag out to the car and she just came with me."[5] Then Appellant told the detectives that he drove to work via Inter-

---

5. At the motion for judgment of acquittal and in its closing argument, the State referenced this statement.

state–95 to Aberdeen, Maryland, from Ms. White's apartment in northern Baltimore City, and clocked into work a little after 8:00 a.m. Like Detective Rabbit, the homicide detectives doubted that Appellant could have driven so quickly to work on that route, especially at that time of morning. Appellant said that he left work at approximately 1:00 p.m. and drove back to Ms. White's apartment, before proceeding to the truck driving school, to pick up a book that he had left there. While there, he locked his car and apartment keys inside, so he used a neighbor's phone to call Ms. White who agreed to meet him at her place of work, Goucher College. He called a cab at about 1:30 p.m. to take him there. It was just after 3:00 p.m., Appellant told the detectives, when he arrived at the truck driving school, after borrowing Ms. White's keys and ATM card, taking the cab back to the apartment, and then driving to his school.

At this point in the interview, the detectives alerted Appellant to a time discrepancy with his time card at work, which indicated that the card had been punched out at 1:35 p.m. on December 3, and compared it to the caller identification feature of the telephone that Appellant used to call Ms. White at work, which indicated that the call to her had been placed at 1:28 p.m. The detectives explained to him that: "[i]t looks like there's something going on here" and "you better let us know about that shit, because we find out anything further, then you're going to be looking like a prime suspect in this stuff[.]" Appellant eventually admitted that a co-worker named Dwayne had punched his card for him at work that afternoon, but that Appellant had clocked himself in that morning at 8:00 a.m. The detectives were suspicious. Detective Patton, when asked at the suppression hearing to describe Appellant's demeanor during the interviews, replied:

> At first, he was sort of cooperative, trying to help us, you with it, and then as we started talking, he became defensive, became—his responses were sort of—weren't to the point. He was sort of beating around the bush. He wasn't responding with direct responses to the questions we were asking him.

A second interview of Appellant occurred at 2:00 p.m. on 4 December 2002. This was preceded by Appellant being given his first *Miranda* warning. He was asked to take a polygraph test in conjunction with this interview. He agreed and the interview took place. His interview occurred after detectives had administered a polygraph examination of Ms. White.[6]

On the prior evening, 3 December 2002, Detective Rabbit applied for and was issued a search warrant for Appellant's car. The first search was conducted around 7:25 a.m. on 4 December 2005. A second search was conducted around 7:15 p.m. that same day. A lab technician and the homicide detectives participated in the searches. During the first search, they found a nine millimeter handgun and a clip with fifteen rounds in a compartment in the trunk of the car. The second search produced a receipt for the purchase from a Wal-mart store, dated 3 December 2002, of a pair of Backwoods Blues jean pants, waist 40/inseam 32. The receipt was found lying on the back seat behind the driver's seat.

An earlier sweep search of the grounds and improvements of Ms. White's apartment complex by police department trainees recovered a blue Wal-mart bag (located at an area behind a dumpster) that contained a pair of previously worn blue jeans and a pair of white gloves, both of which appeared to be stained with blood. Paper labels for Backwoods Blues jean pants, waist 40/inseam 32, were also contained in the bag. The detectives brought Ms. White to the processing bay to see if she could identify the bloody clothing. She identified the clothing as Appellant's. The detectives then recalled that the jeans Appellant was wearing at the police station looked new, "more or less right off the hanger."

In response to these discoveries, the detectives returned to Appellant's interview room in the Homicide Unit at about 8:55 p.m. on 4 December 2002 and asked him to show them the label on his jeans. According to Detective Patton, Appellant "did not react at all, stood up, and unbuckled his pants,"

---

6. The record does not reveal the contents of this polygraph interview.

revealing a sewed-in label that was consistent with the paper labels contained in the Wal-mart bag recovered from the dumpster near Ms. White's apartment. Detective Patton asked Appellant to give the police the jean pants he was wearing. The two detectives and a crime lab technician were present and the interview room door was open. Without a word, Appellant complied. After taking off his pants, Detective Patton noticed what appeared to be a smear of blood on one of Appellant's socks, and so asked Appellant for the rest of his clothing. In response, Appellant took off his clothes and laid them on the table. He was given a jumpsuit and shoe covers to wear.

At 9:15 p.m. on 4 December 2002, Appellant was again given a *Miranda* warning and he agreed to answer questions. Thirty minutes into that questioning, Appellant invoked his right to remain silent and the interview ended.[7] Appellant was not placed under arrest at that time. Instead, he was driven to his mother's house around 12:00 a.m. on 5 December by Detective Patton and his partner.

The State's evidence at trial revealed the following additional facts:

Appellant began dating Ms. White in early 2001. Their relationship initially concluded approximately a year later because Ms. White felt that Appellant was not "pulling his weight . . . financially." Ms. White dated other men after she and Appellant separated, including a Mr. Julian Brown. In November of 2002, Appellant and Ms. White rekindled their relationship. At that time, Appellant worked part-time at C & S Wholesalers, located in Aberdeen, Maryland, and attended a vocational school part-time in an effort to earn a commercial truck-driving license. Ms. White planned to move into Appellant's house in mid-December of 2002. Over the preceding Thanksgiving weekend, after borrowing Ms. White's cell phone, Appellant confronted Ms. White about telephone calls

---

7. Here again, the contents of this interview are not revealed in this record.

that she had made to Mr. Brown earlier that November. They discussed the matter, and, according to Ms. White, "moved on."

Appellant was close with Ms. White's children, Marciana and Marc Ringo, Jr. Marciana and Marc, Jr. called Appellant "Daddy-mall" and would run to greet him when they heard him at their front door. Appellant would often stay overnight at Ms. White's apartment, sometimes bringing his daughter, Brianna, with him. With Ms. White's permission, Appellant would take her children to doctors' appointments, help Marciana with her homework, attend PTA meetings, and transport Marc, Jr. to football practice. He continued to help with the parenting of Marciana and Marc, Jr. during the period of time when he and Ms. Ringo were not dating. Ms. Ringo listed Appellant as an emergency contact for Marciana at school and did not remove his name from the list during the period when they were not dating.

Ms. White was separated from the children's father, Mr. Ringo, who would come to Ms. White's apartment to take Marc, Jr. to daycare and take the children for visits with his family. When Appellant would try to speak with Mr. Ringo, Mr. Ringo would not respond.

On the night before the murder of Marciana, Appellant visited Ms. White at her apartment. He was upset and told her that he had just learned that a good friend of his had been murdered. Ms. White comforted him. Appellant stayed over that night and slept in Ms. White's bedroom while Marciana and Marc, Jr. slept beside them on a mattress on the floor.

On 3 December 2002, Ms. White left for work at around 7:10 a.m. Appellant was still in bed at that time and the children were getting ready for school. When Ms. White called home from work at approximately 7:35 a.m., Appellant told her that Marciana had left for school and that he was waiting for Mr. Ringo to pick up Marc, Jr. and take him to daycare. At 7:40 a.m., Mr. Ringo called to say that he was waiting outside for Marc, Jr. Appellant sent Marc, Jr. outside.

At 11:00 a.m., when Appellant was supposedly at his place of work, he called Ms. White at her work to remind her to look

into changing Marc, Jr.'s daycare facility in anticipation of their upcoming move to Appellant's house. According to bank records and a surveillance tape, at around 12:30 p.m., Appellant used his debit card to purchase the jeans that he was wearing when questioned at the Homicide Unit at a Wal–Mart store in Aberdeen, Maryland near his workplace. Appellant called Ms. White again at 12:43 p.m. to tell her that he had gone to her apartment and mistakenly locked his keys inside. They agreed that he would meet her at her place of employment, Goucher College, to borrow her keys. He arrived a little after 2:00 p.m., wearing his work clothes. After borrowing her ATM card to get some money to pay for the cab, Appellant left with her keys. He returned within the hour to restore to Ms. White her keys.

Marciana, in fact, did not attend school that day. When Ms. White returned home from work around 4:45 p.m., she found a message on her answering machine from Marciana's teacher to that effect. A neighbor called the police while Ms. White searched for her daughter. Ms. White then telephoned Appellant at school and told him that Marciana was missing. He replied, "No way, no." Ms. White spoke to another neighbor, Constance Greene, who said that she had seen Marciana getting into Appellant's car that morning. Ms. White asked Appellant about this and he told her that Marciana had come home to get her homework signed and that he dropped her off at school. At Ms. White's urging, Appellant agreed to leave the truck driving school and come to her apartment. Appellant, Ms. White, and Mr. Ringo spent that evening, as well as the following day, at the Missing Person's and Homicide Units of the Baltimore City Police Department, as outlined *supra*.

DNA samples taken from the worn jeans in the Wal-mart bag recovered at Ms. White's apartment complex were found to match Appellant's DNA profile. Samples taken from blood stains on one of the gloves and the blood stains on the worn blue jeans found in the Wal-mart bag matched Marciana's DNA profile. Samples taken from stains on Appellant's hat and sock, which he had worn at the police station, matched

Appellant's DNA profile, but not Marciana's profile. In addition, evidence confirmed that a co-worker of Appellant's caused Appellant's work time card to be punched in around 8:00 a.m. on 3 December 2002.

On 5 December 2002, Ms. White received a letter in the mail postmarked the previous day, which stated: "Tell Starks I want $5000. Put in bag and put in men's bathroom at Druid Hill Park by 8 p.m. tomorrow or the girl dies. If she die, let just say we even. An eye for an eye." [8] Ms. White gave the letter to the police, who found Appellant's fingerprint on the letter and DNA matching his profile in a saliva sample taken from the envelope flap.

Marciana's body was discovered on 12 December 2002 by two children walking home from school in a wooded area near the intersection of Joppa Farm Road and Haverhill Road in Harford County. Her frozen body was partially covered by snow. Forensic evidence indicated that she did not suffer instantaneous death. One of her hands gripped leaf debris that was similar to the kind of debris surrounding her body. Cuts on her hands indicated defensive wounds. Marciana died from multiple cutting wounds, including a gaping wound to the neck, and a blunt force injury to the head that occurred after the infliction of the cutting wounds.

Agents of the Federal Bureau of Investigation (FBI) arrested Appellant in Birmingham, Alabama, on 24 December 2002 after tracking him to a hotel where he had registered under an assumed name.

Additional facts, particularly as relevant to the proceedings in the trial court implicated by the issues raised in this appeal, will be supplied in our analysis of the issues.

## II.

Section 2–401 of the Criminal Law Article outlines the scope of our required review in capital cases. It provides, in pertinent part:

---

**8.** Starks was a nickname for Mr. Ringo.

(a) *In general.*—(1) After a death sentence is imposed and the judgment becomes final, the Court of Appeals shall review the sentence on the record.

(2) The Court of Appeals shall consolidate an appeal from the verdict with the sentence review.

* * *

(d) *Consideration by Court of Appeals.*—(1) In addition to any error properly before the Court on appeal, the Court of Appeals shall consider the imposition of the death sentence.

(2) With regard to the death sentence, the Court of Appeals shall determine whether:

(i) the imposition of the death sentence was influenced by passion, prejudice, or any other arbitrary factor;

(ii) the evidence supports the finding by the court or jury of a statutory aggravating circumstance under § 2–303(g) of this title; and

(iii) the evidence supports a finding by the court or jury that the aggravating circumstances outweigh the mitigating circumstances under § 2–303(h) and (i)(1) of this title.

(3) In addition to its review under any direct appeal, with regard to the death sentence, the Court of Appeals shall:

(i) affirm the death sentence;

(ii) set the death sentence aside and remand the case for a new sentencing proceeding under § 2–303 of this title; or

(iii) set the death sentence aside and remand the case for modification of the sentence to imprisonment for life.

Md.Code (2002, 2005 Supp.), Criminal Law Article, § 2–401.

## III.

A clear majority of the Court affirms Abeokuto's convictions. As required to be considered by § 2–401 of the Criminal Law Article in every death penalty appeal, the Court, by a majority concurring, concludes, on this record, that the imposition of the death penalty was not influenced by passion, prejudice, or other arbitrary factor. Because of an unusual divergence of views among the members of the Court regarding the sentencing issues, however, there is no majority view

on all of those issues. That notwithstanding, the sentences shall be vacated and the case remanded to the trial court for a new sentencing proceeding. The divergence that gives rise to this result is as follows: (1) Chief Judge Bell, Judge Greene, and I would vacate the sentences based on the failed waiver of the right to have a jury impose sentence, a view not shared by the other members of the Court; and (2) Chief Judge Bell, Judge Raker, and Judge Greene, for different reasons expressed in Judge Raker's concurring and dissenting opinion, would reverse the sentence of death. Thus, a combined four members of the Court find some reversible error or another affecting the sentencing proceeding and a new one is required.[9]

As to the considered dicta expressed in this opinion, for the benefit of the trial court on remand, regarding certain of the other sentencing issues raised by Abeokuto, a majority of the Court agrees with the analyses as to the increase in the sentence for the extortion conviction and the need to merge for sentencing purposes the convictions for kidnapping and child kidnapping.

### A.

#### *Guilt/Innocence Phase Issues*

#### 1.

#### *Waiver of Trial by Jury*

 Appellant alleges that the record contains no support for the trial court's determination that he voluntarily or know-

---

9. The new sentencing proceeding, whether before a judge alone or a jury, may include consideration of the sentence of death in accordance with the weighing of aggravating and mitigating circumstances by a preponderance of the evidence standard, *see Evans v. State*, 389 Md. 456, 482–83, 886 A.2d 562, 577 (2005); *Oken v. State*, 378 Md. 179, 253, 835 A.2d 1105, 1148 (2003), *cert. denied*, 541 U.S. 1017, 124 S.Ct. 2084, 158 L.Ed.2d 632 (2004), and irrespective of Appellant's argument under *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), as to the validity of the indictment, *see Evans*, 389 Md. at 472–80, 886 A.2d at 571–76.

ingly waived his right to trial by jury. This argument is based upon the trial court's failure to inquire expressly whether: Appellant had been coerced or threatened into waiving his right to a jury trial; anyone, including defense counsel or the prosecutor, had promised Appellant anything in exchange for his waiver; Appellant was under the influence of alcohol, drugs, or prescription medications that might impact his ability to make a voluntary waiver; and, the state of Appellant's mental health at the time could have affected his ability to make a knowing voluntary the waiver.

Appellant elected on 16 August 2004 to waive his right to a jury trial. The following preliminary colloquy occurred between Appellant, defense counsel, prosecutor, and court:

DEFENSE COUNSEL: Stand up, Mr. Abeokuto. Mr. Abeokuto, we have spoken about this on a number of occasions, that is, that you have the right to have this matter tried either before Judge Bollinger or a jury on the issue of guilt or innocence. If you decide to pursue a jury trial, you would be faced with the selection and you would be involved—in fact, I think you were involved to a certain extent earlier in the selection of twelve individuals selected from the voter and motor rolls of Baltimore County. They would listen to the evidence that [the] State presented, listen to any evidence that we might present, and they would have to decide whether or not if you were guilty on any of these counts that you have been charged with.

In making that decision, before they could convict you, find you guilty or not guilty, all twelve of those jurors would have to agree on the verdict, otherwise a hung jury would result. A mistrial would be declared and the State would be free to prosecute you all over again before a different jury next time or the second time around.

You want it in front of the Judge alone, a Court trial. Do you understand your right to have your matter tried by a jury on the issue of guilt or innocence?

DEFENDANT: Yes.

DEFENSE COUNSEL: All right. You can waive the right to be tried in front of a jury and have the Court listen to the evidence and decide whether the State had proven you guilty beyond a reasonable doubt. If the Judge harbors any doubt based upon reason, then the Judge would be duty bound to find you not guilty.

Do you understand that?

DEFENDANT: Yes.

DEFENSE COUNSEL: All right. Tell us what is your decision as to whether or not you want a Court trial or a jury trial on the issue of guilt or innocence?

DEFENDANT: Court.

DEFENSE COUNSEL: All right. Now, let me also add this, that it should be made clear that regardless of whether you choose a Court trial or a jury trial on the issue of guilt or innocence, if, if you are found not guilty you don't have to worry about any further proceedings. If you are found guilty, then the next stage quite possibly will involve another choice of jury or Judge.

Do you understand that?

DEFENDANT: Yes.

DEFENSE COUNSEL: But no matter what you choose here today, Court trial or jury trial, it does not impact, if we get to the next stage, on whether you want a Court trial or jury trial for that stage of these proceedings.

You understand that, correct?

DEFENDANT: Correct.

DEFENSE COUNSEL: So it is my understanding at this point you would want a Court trial and you would waive your right to a jury trial, is that correct?

DEFENDANT: Yes.

DEFENSE COUNSEL: Very good. Judge, should we also speak about the—since it is a bifurcated proceeding so that the Jury Commissioner would have some sense as to [the] guilt stage as well if we get to that, or do you want to wait until after—

COURT: Prepared to waive that now—I think we have to wait until after, don't you?

PROSECUTOR: Yes.

DEFENSE COUNSEL: That's fine.

COURT: Let me just say this to him so we dot our I's and cross our T's. You realize if you elected a jury trial the burden of proof would be that the State would have to show that jury unanimously, that means all together, all of them must agree together, beyond a reasonable doubt and to a moral certainty, that's the burden of proof they have, do you understand that?

DEFENDANT: Yes.

COURT: That's the same burden of proof that myself or some other Judge would have, but in the case of a jury that is the burden of proof. Do you understand that.

DEFENDANT: Yes, sir.

COURT: Do you have anything else open as to the election.

PROSECUTOR: I just would like to clarify that the next stage, just so it is clear on the record, that in the event the Defendant is found guilty of a first degree murder count, the fact that the State is seeking the death penalty, that the next stage would be the sentencing stage, and the Defendant would not by electing a Court trial at this time, he still has an election to make as to a Judge or a jury to make the, to make the decision on whether the sentencing could be death, life without parole or life sentence, and that by electing to go forward today, you are not impacting or you are not prejudicing your right to make that election at a later time.

DEFENSE COUNSEL: Judge, I think we have covered that but that is fine. We all understand. Don't you, Mr. Abeokuto?

DEFENDANT: Yes.

COURT: Do you have any questions of [Defense Counsel] about that or me?

DEFENDANT: No, sir.

The court concluded on the record that "Defendant has knowingly and voluntarily and intelligently waived his right to a jury trial on the issue of guilt or innocence."

A defendant may elect to waive his or her right to a trial by jury and instead be tried by the court.[10] The right to trial by jury is guaranteed by the Sixth Amendment to the United States Constitution[11] and by Articles 5 (entitled to trial by jury), 21 (in all criminal prosecutions, every man has a right to trial by an impartial jury and may only be found guilty by unanimous consent of the jury), and 24 (due process) of the Maryland Declaration of Rights. To waive properly the constitutionally protected right to trial by jury, the defendant must elect to do so by a knowing and voluntary waiver election. *Smith v. State*, 375 Md. 365, 377–80, 825 A.2d 1055, 1063 (2003). Md. Rule 4–246 effectively summarizes the protocol regarding jury trial waiver at the guilt/innocence phase of a criminal proceeding and provides, in pertinent part:

(a) **Generally.** In the circuit court a defendant having a right to trial by jury shall be tried by a jury unless the right is waived pursuant to section (b) of this Rule. If the waiver

---

**10.** We have stated before that there exist "many, many instances where trial before the court is in the best interest of the accused." *Martinez v. State*, 309 Md. 124, 131 n. 5, 522 A.2d 950, 953 n. 5 (1987) (quoting *State v. Zimmerman*, 261 Md. 11, 19, 273 A.2d 156, 160 (1971)).

The defendant may want to waive a jury trial when he feels that a jury panel composed of members of the community will be prejudiced against his case. This may be especially true when the defendant's alleged crime has received wide publicity or is particularly gruesome. The defendant may also feel that a judge would be less apt than a jury to draw negative conclusions from the defendant's appearance or manner of speech. Or, he may merely prefer that the arbiter of his fate be one person trained in the law rather than twelve laymen. *Id.* (quoting C. Whitebread, *Criminal Procedure* § 27.03, at 607 (1986)). Being charged with the brutal murder of a small child might present a basis to make that election.

**11.** The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law...."

is accepted by the court, the State may not elect a trial by jury.

(b) **Procedure for acceptance of waiver.** A defendant may waive the right to a trial by jury at any time before the commencement of trial. The court may not accept the waiver until it determines, after an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, that the waiver is made knowingly and voluntarily.

Md. Rule 4–246(a)–(b) (2004).[12] The trial court therefore is required to conduct an examination of the defendant, in open court, to determine whether the defendant waived voluntarily (with intention and without duress or coercion) and knowingly his or her right to be tried by a jury. Md. Rule 4–246(b); *State v. Hall,* 321 Md. 178, 182–83, 582 A.2d 507, 509–10 (1990); *Martinez v. State,* 309 Md. 124, 133–34, 522 A.2d 950, 955 (1987) (citing *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970) and *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, (1938)); *see also State v. Bell,* 351 Md. 709, 720 A.2d 311 (1998) (holding that, for the waiver to be made knowingly, the defendant must have some knowledge of the jury trial; full knowledge is not required). The defendant must directly respond to the court's examination because the waiver must come from the defendant. *Martinez,* 309 Md. at 133, 522 A.2d at 954 (Citation omitted). Although the examiner may be the court, the prosecutor, and/or the defense counsel, it is the trial court that "bears the ultimate responsibility for ensuring that the accused has tendered a valid waiver." *Martinez,* 309 Md. at 133 n. 9, 522 A.2d at 954 n. 9. "The questioner need not recite any fixed incantation." *Hall,* 321 Md. at 182, 582 A.2d at 509; *Martinez,* 309 Md. at 134, 522 A.2d at 955. The trial court "must, however, satisfy itself that the waiver is not a

---

12. Section (c), regarding withdrawal of the defendant's waiver, is not at issue in this case. We apply Rule 4–246 as adopted at the time of the jury waiver election in 2004.

product of duress or coercion and further that the defendant has some knowledge of the jury trial right before being allowed to waive it." *Hall,* 321 Md. at 182–83, 582 A.2d at 509; *Martinez,* 309 Md. at 134, 522 A.2d at 955. Whether the waiver is valid depends upon the facts and totality of the circumstances of each case. *Hall,* 321 Md. at 182, 582 A.2d at 509.

In *Hall, supra,* we concluded that, where no facts in the particular case suggested a propensity for an involuntary or unknowing waiver by the defendant, a trial court is not required to ask the defendant whether he or she understood what he or she had been told about the jury trial process, or whether the election of a court trial was the result of any physical or mental duress or coercion. *Hall,* 321 Md. at 183, 582 A.2d at 509–10.[13] The circumstances that we considered in that case included the following pertinent facts: (1) the defendant had signed a written waiver form prior to the in-court election to waive jury trial, which acknowledged that the

---

**13.** We stated in *Hall:*

> Considering the totality of the circumstances in the present case, see *Dortch v. State* [290 Md. 229, 235, 428 A.2d 1220 (1981)], we think that the trial judge could fairly find that Hall intentionally relinquished his known right to a jury trial by his voluntary act in waiving that right.
>
> ❖ * *
>
> While the court did not specifically ask Hall whether he understood what he had been told, or whether his election of a court trial was the result of any physical or mental duress or coercion, we think that the record before us demonstrates that the court could fairly be satisfied that Hall had the requisite knowledge of the jury trial right, that the waiver was voluntary, and that the requirements of the rule were satisfied. Moreover, the court was not required to advise Hall, as he contends, as to the details of the jury selection process.

*Hall,* 321 Md. at 183, 582 A.2d at 509–10.

In *Tibbs v. State,* 323 Md. 28, 32, 590 A.2d 550, 551 (1991), we concluded, however, that it was

> not sufficient that an accused merely respond affirmatively to a naked inquiry, either from his lawyer or the court, that he understood that he has a right to a jury trial, that he knows "what a jury trial is," and waives that right "freely and voluntarily" [without more inquiry,] [n]otwithstanding that Tibbs may have had some prior unspecified experience with the criminal justice system....

The trial court in *Tibbs* should have inquired further.

defendant had a right to a jury, that unanimity of all 12 jurors was required for a guilty verdict, and that the applicable standard of guilt for both a jury trial and bench trial was guilty beyond a reasonable doubt; (2) the trial judge, in open court, engaged in a short colloquy stating the same and asked the defendant whether he wanted a jury trial or court trial; (3) the defendant had waived his right to jury trial on a prior occasion (during in-court plea negotiations); and (4) the defendant had been represented by counsel each time he had elected to waive his right to a jury trial. *Hall*, 321 Md. at 179–83, 582 A.2d at 509–10. Thus, the colloquy in *Hall* was sufficient and the waiver valid.

In *Dortch v. State*, 290 Md. 229, 428 A.2d 1220 (1981), we held that the trial court did not commit error when it failed to inquire specifically whether the jury trial waivers by two defendants in separate cases were induced by promises or by physical or mental coercion. While noting that no facts existed supporting a finding of involuntariness as to the waivers election, we highlighted, in support of the trial court's finding of voluntariness, that one defendant, when prompted, explained to the court what he thought a jury trial to be and told the judge on three separate occasions that he did not want a jury trial. *Dortch*, 290 Md. at 233, 428 A.2d at 1223. Even so, we advised judges that it was a "preferable practice" to inquire about the voluntariness of the defendant's waiver election. *Dortch*, 290 Md. at 236, 428 A.2d at 1224.

In *Martinez, supra*, we found that the transcript of the waiver hearing did not support the court's finding that the defendant waived voluntarily his right to a jury trial. *Martinez*, 309 Md. at 134–35, 522 A.2d at 955. The relevant portion of the waiver hearing transcript revealed that the defendant was taking Lithium, a medicine prescribed to treat schizophrenia, paranoia, and possibly other psychiatric or psychological conditions; the defendant did not feel that he was "presently suffering from any physical illness;" and stated that he understood that he was entitled to a jury trial. *Martinez*, 309 Md. at 127–28, 522 A.2d at 951–52. When asked by the court, "Are you voluntarily waiving that right [to a jury

trial]?," the defendant replied, "I am a little bit nervous." *Martinez*, 309 Md. at 128, 522 A.2d at 952. After further questions about whether the defendant understood the jury selection process and guilt beyond a reasonable doubt standard, the trial judge asked, "Has any person, either inside or outside of this courthouse, made you any promise, or has anyone threatened you in any way in order to have you give up your right to a jury trial?". *Martinez*, 309 Md. at 129, 522 A.2d at 952. The defendant answered, "Yes." *Id.* The trial court accepted the jury waiver. We found this last question "particularly relevant," concluding that the record did not disclose a knowledgeable and voluntary waiver of a jury trial, and ordered a new trial. *Martinez*, 309 Md. at 135–36, 522 A.2d at 955–56 ("It is one thing to say that a trial court need not recite a specific litany relating to the voluntariness of an election. But it is quite another thing to say that, if the court decides to ask such a question, it is free to ignore the answer.").

We conclude, after considering the totality of the circumstances, that the record in the present case demonstrates a knowing and voluntary waiver of Appellant's right to a jury trial. Defense counsel and the trial court asked Appellant a total of seven times whether he understood the various "byte-size," if you will, explanations given of his rights and jury trial process. They and the prosecutor also discussed with Appellant the jury trial process, standard of guilt, burden of proof, the necessity of a unanimous guilty verdict, and that, if convicted, Appellant would have a later opportunity to choose whether to waive his right to a sentencing by jury. Appellant was represented by counsel, who, prior to the 16 August 2004 hearing, had discussed with Appellant the decision whether to elect a court or jury trial. Finally, Appellant affirmed that he wanted a court trial.

As we stated in *Hall*, the trial court is not required to engage in a fixed litany or boilerplate colloquy with a defendant. No facts from the record demonstrate that the court had reason to ask Appellant whether he had been coerced or threatened to waive his right to a jury trial or whether

anyone, including defense counsel or the prosecutor, promised Appellant anything in exchange for his waiver. Therefore, questions directed to those areas were not required in this case. The court, after viewing the behavior of Appellant and defense counsel (who clearly advised Appellant to waive his right to a jury trial), did not believe, we assume, that defense counsel was forcing Appellant, by coercion or otherwise, to elect a bench trial.

While the trial court was aware that Appellant may have been taking a prescription medication and that Appellant's mental health had been an issue earlier in the proceedings, the court's failure to ask anew about these particular facts during the colloquy was not error at that point in the proceedings when the jury trial waiver was given. We look at the record in its entirety. On 22 June 2004, the trial court commenced a competency inquiry as to Appellant's ability to stand trial. The court heard testimony from several medical experts, including a psychiatrist, Dr. Dean A. Inouye, a State's witness, who conducted a psychiatric-forensic evaluation to determine Appellant's competency to stand trial. On cross-examination by defense counsel, Dr. Inouye stated that he learned that Dr. Coleman, a clinical psychiatrist at the Baltimore County Detention Center where Appellant resided, had prescribed for Appellant the anti-psychotic medication Geodon some time after 20 April 2004 (the date Dr. Inouye examined Appellant).

The following cross-examination of Dr. Inouye by defense counsel occurred regarding the Geodon prescription:

DEFENSE COUNSEL: Okay. Now, can you inform the Court what Geodon is?

DR. INOUYE: Geodon is a medication that was originally marketed as medication to treat psychotic symptoms.

DEFENSE COUNSEL: Okay.

DR. INOUYE: It has also been found helpful to treat symptoms of bi-polar disorder.

DEFENSE COUNSEL: In your discussions with Dr. Colman, the Geodon was prescribed for psychotic symptoms?

DR. INOUYE: For this diagnosis of Psychotic Disorder, N[ot] O[therwise] S[pecified].

DEFENSE COUNSEL: Okay.

DR. INOUYE: Not otherwise specified. I'm sorry.

DEFENSE COUNSEL: Okay. Does Geodon have possible side effects?

DR. INOUYE: It does have possible side effects.

DEFENSE COUNSEL: Okay. So, a doctor prescribing that would have to be, take some care in terms of prescribing it? You don't do it like you would say, take two Tylenol?

DR. INOUYE: Absolutely not.

DEFENSE COUNSEL: Okay. Were you aware of any other prescriptions, any other medications that were prescribed?

DR. INOUYE: I don't recall. Not at that time.

DEFENSE COUNSEL: Okay. Did Dr. Coleman say anything about starting him on Prozac?

DR. INOUYE: I don't recall that he was taking Prozac at the time.

DEFENSE COUNSEL: Okay. Did Dr. Coleman speak to you about attempting to try Heladol with Mr. Abeokuto?

DR. INOUYE: No. Heladol would have been a medication with far more side effects. Potential side effects. I'm sorry.

\* \* \*

DEFENSE COUNSEL: Okay. Did you follow up with Dr. Coleman with regard to Mr. Abeokuto's progress while taking the Geodon?

DR. INOUYE: No, I did not.

DEFENSE COUNSEL: Okay.

DR. INOUYE: You mean, after the completion of our evaluation?

DEFENSE COUNSEL: Like a week later? Or how long would it take for Goedon to make a difference?

DR. INOUYE: It's a medication that doesn't work over-night. If its effective it works very gradually. It is not a high potency anti-psychotic medication. And the response to the drug probably wouldn't be seen for a few days. Depending on whether or not you know, there were true symptoms that would respond to the medication. Whether he could keep Mr. Abeokuto on the medication. That is [sic] did not have side effects that would have caused him to stop the medication presuming the medication dose was sufficiently high. It would ordinarily take several days. I mean, again, the medication works very gradually as I said. If a person were truly psychotic a clinician and the patient himself might see improvement over time. Even over weeks.

\* \* \*

Whether its an anti-psychotic medicine or a[sic] anti-high blood pressure medicine. You have to prescribe it and then monitor it to see if there is a beneficial response. And to make sure the benefit outweighs what other risks may be potential for that medicine.

Dr. Coleman was not called to testify by either side. On 16 August 2004, the court concluded the competency hearing after a brief examination by defense counsel of Dr. David Waltos, a psychiatrist associated with the Circuit Court's staff. He testified that after a 15 or 20 minute screening interview of Appellant, that he "got a sense that there was an issue" concerning a possible dissociative disorder, but could not reach a conclusion in the brief time that he spent with Appellant. At the conclusion of this testimony, the court found Appellant competent to stand trial based upon the testimony presented on 22 June 2004 and 16 August 2004 and reports submitted regarding Appellant's medical diagnoses, screening, and medication prescribed. Appellant does not here question directly the outcome of the competency proceeding.

Literally a minute after finding Appellant competent to stand trial, the trial court conducted the jury trial elec-

tion/waiver inquiry. The short time period between when the trial court finished hearing and considering testimony and other evidence regarding Appellant's mental health and medication treatment and Appellant's election to waive a jury trial suggests that the court remained aware, for the jury trial waiver proceedings, of what it learned of Appellant's mental status and medication and that the two decisions were virtually contemporaneously considered. The ground plowed at the competency hearing, therefore, need not be replowed at the jury trial waiver proceeding. These same circumstances, however, serve also to differentiate Appellant's *valid* jury trial waiver from what we shall later determine to be his *invalid* jury sentencing waiver, discussed *infra* at Section III(B)(1) of this opinion. We also distinguish the present case from the facts in *Martinez* because here the trial judge did not ignore an affirmative answer to a question aimed at coercion and duress. Nor does the record reveal evidence of outward symptoms or reluctance on Appellant's part when waiving his jury trial right. Therefore, we hold that the trial court did not err in determining that Appellant's waiver of his right to trial by jury for the guilt/innocence phase was knowing and voluntary.

2.

*Evidence of Post–Miranda Silence Admitted at Trial*

██ Appellant argues that the trial court committed reversible error in admitting testimony at trial by a Special Agent of the FBI who informed the court that Appellant was read *Miranda* warnings and chose to remain silent when arrested in Alabama on 24 December 2002.[14] This testimony also was incorporated by reference into the sentencing proceeding. The testimony consisted of the following:

---

14. As we recently stated in *Weitzel v. State*, 384 Md. 451, 456, 863 A.2d 999, 1001–02 (2004) and *Kosh v. State*, 382 Md. 218, 227, 854 A.2d 1259, 1264 (2004), evidence of a defendant's post-arrest silence is inadmissible as substantive evidence of his guilt.

Q: After the Defendant was placed in custody, then what happened to him?

A: He was—it was early in the morning of the 24th, he was transported to the Jefferson County jail and the next morning he was transported to the District Court to go before the magistrate on his initial appearance.

Q: And who transported him to go before the magistrate for his initial appearance?

A: Transporting agents were myself, Special Agent Ralph Phillips and we were joined at the courthouse by supervisory Special Agent Jimmy Brown.

Q: All right. And did there come a time that the Defendant was advised of his rights?

A: Yes, he was advised of his rights by supervisory Special Agent Jimmy Brown. After explaining the rights to the Defendant, the Defendant did not wish to speak.

Q: Where did the advice of rights take place?

A: Took place inside of a government vehicle.

Q: Okay. Subsequently did the Defendant make any statements without being asked questions by you all?

A: Correct. Shortly after being advised of his rights and indicating that he did not wish to waive those rights, a few moments passed, maybe a minute, before the Defendant asked the question of us, what, what this was all about, in his words.

Q: Did anyone respond to his question?

A: Yes. Supervisory Special Agent Brown indicated to the Defendant that he was under arrest for mailing threatening extortion communications and that there was also wanted posters from the State regarding his alleged involvement in kidnapping and murder.

Q: And did he ever have a response to being advised of that?

A: His response was that, yes, he'd heard something about a kidnapping but not murder. Mr. Brown, Supervisory Special Agent Brown then again asked the Defendant if he

wanted to waive his rights regarding speaking to the agents and again the Defendant said no, he did not wish to waive those rights. Supervisory Special Agent Brown informed him that only questions we would be asking of him from that point on were just personal identifiers, name, date of birth and such.

The State argues that this claim is not preserved because no objection was made to any of the Special Agent's testimony. Appellant requests that we review this claim, despite the lack of objection at either trial or sentencing,[15] under the plain error standard. We decline to do so.

Our review of this evidentiary issue is a discretionary decision. "Ordinarily, the appellate court will not decide any [issue not presented to the trial court] unless it plainly appears by the record to have been raised in or decided by the trial court. . . ." Md. Rule 8–131(a) (2004); *see also Conyers v. State*, 354 Md. 132, 149–51, 729 A.2d 910, 918–19 (1999); *Walker v. State*, 338 Md. 253, 262, 658 A.2d 239, 243 (1995); *State v. Bell*, 334 Md. 178, 187, 638 A.2d 107, 112 (1994); Md. Rule 4–323(a) (2004) ("An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived."); *Leuschner v. State*, 41 Md.App. 423, 436, 397 A.2d 622, 630 (1979) (holding that "[i]t is axiomatic that to preserve an issue for appeal some objection must be made or a party will be deemed to have waived an objection"). Although some of our previous death penalty cases may have suggested that we will be less strict about the failure to properly preserve issues for review, we reiterated in *Conyers v. State* that "despite the special character of a capital case, the tried and tested rules of evidence and procedure still apply." 354 Md. at 150, 729 A.2d at 919 (quoting *Bruce v. State*, 328 Md. 594, 611, 616 A.2d 392, 400 (1992)). In *Conyers*, we explained the reasons why we ordinarily do not

---

**15.** This same defect afflicts several of Appellant's other appellate issues, to wit questions presented numbers (9), (10), and (11).

exercise the discretion to address and decide unpreserved issues:

> The rules for preservation of issues have a salutary purpose of preventing unfairness and requiring that all issues be raised in and decided by the trial court, and these rules must be followed in all cases including capital cases. The few cases where we have exercised our discretion to review unpreserved issues are cases where prejudicial error was found and the failure to preserve the issue was not a matter of trial tactics.

* * *

> Counsel should not rely on this Court, or any reviewing court, to do their thinking for them after the fact. Furthermore, we have stated that even in a death penalty case, with the potential finality of its outcome, litigation cannot continue *ad infinitum* through counsel "withholding issues or framing the questions differently each time."

*Conyers*, 354 Md. at 150–51, 729 A.2d at 919–20 (Internal citation omitted).

■ We will review the unpreserved claim only where the unobjected to error can be characterized as "compelling, extraordinary, exceptional, or fundamental to assure the defendant a fair trial" by applying the plain error standard. *Richmond v. State*, 330 Md. 223, 236, 623 A.2d 630, 636 (1993) (Citations omitted); *Rubin v. State*, 325 Md. 552, 588–89, 602 A.2d 677, 694 (1992). We decline to apply the plain error standard in the present case because the claim is neither compelling nor extraordinary. The trial judge properly sat as the trier of fact. The testimony of the Special Agent at issue likely did not effect the court's finding of guilt in light of the overwhelming evidence establishing Appellant's guilt, thus the unobjected-to error was not fundamental to assure Appellant a fair trial. Defense counsel may have elected not to object as a tactical decision. It would not be wise for this Court to review the unpreserved claim in the context of the record of the direct appeal where that possibility goes unexplored. Thus,

Appellant's failure to object to the agent's testimony precludes our review of this contention.

### 3.

### *Denial of Requests for Continuance*

 Appellant argues for reversible error in that the lower court denied requests for a continuance of the trial and sentencing by his then defense counsel, Warren Brown, Esq. Mr. Brown asserted that he would not be prepared for the trial or sentencing without the continuance. Initially, an assistant public defender represented Appellant with regard to the charges. In March 2004, the public defender and Appellant's mother informed the trial court that Appellant planned to engage Mr. Brown as privately-retained counsel to represent him at trial and that Mr. Brown required a continuance of trial, which was then scheduled to begin on 6 April 2004. At a hearing on 5 April 2004, the court noted that Mr. Brown had not entered his appearance yet, but, nonetheless he had been made aware of the scheduled hearing and trial dates. Upon inquiry, Appellant stated that he wanted to proceed with his assigned public defender as counsel. The trial date was re-set to 23 August 2004 to accommodate the conduct of the competency proceeding.

On 16 July 2004, Mr. Brown entered his appearance in the case and the Public Defender's Office filed a motion to strike that office's appearance. The matter was considered by the trial judge at a hearing on 6 August 2004. Mr. Brown requested a postponement of the trial because he now expressed the desire to retain his own defense experts to examine the blood and soil samples. In response, the State told the court that it had supplied the relevant discovery to the Public Defender's Office previously and that it initiated no challenge to the forensics at the suppression hearings. In addition, the State noted that Mr. Brown had represented Appellant in related matters before the federal district court for months prior to entering his appearance in the present case. The trial judge referred the matter to the Circuit

Administrative Judge, who denied the request stating, "I am not satisfied that the reasons at this point in time two weeks prior to trial are satisfactory."

The decision whether to grant a request for continuance is committed to the sound discretion of the court. *Ware v. State*, 360 Md. 650, 706, 759 A.2d 764, 794 (2000). We conclude that the court's decision to deny Appellant's request for continuance was not an abuse of discretion. Over five months elapsed between the announcement of Brown's involvement in Appellant's defense (although he did not enter his appearance formally until 16 July) and the commencement of trial on 23 August 2004. During that time, whether formally represented by the Public Defender's Office or Mr. Brown, Appellant did not take issue with the State's potential forensic evidence, for which full discovery had been provided, until two weeks prior to the scheduled commencement of trial. Moreover, Appellant (and Mr. Brown) received the benefit for trial preparation purposes of the continuance of the trial date from 6 April to 23 August to accommodate the competency inquiry. We therefore find a reasonable basis for the lower court's decision to deny the request.

We likewise find no abuse of discretion in the trial court's denial of Appellant's request for continuance of sentencing. The trial court set the date of sentencing with the assistance of the prosecutor and defense counsel, Mr. Brown. Mr. Brown filed a Motion for Continuance with the court around 4 November (nine days before the sentencing hearing) because he found it difficult to focus the necessary attention on the case with its troubling facts and because the witnesses who had worked with the public defender to develop evidence of mitigating circumstances were not prepared for the hearing as a result of a miscommunication by Mr. Brown. The trial court, in its order denying the request, stated:

This case has a long and troubled history. The indictment was brought fourth by the Grand Jury of Harford County and the case was transferred to Baltimore County and assigned to the Honorable J. Norris Byrnes. Months

went in to the preparation for trial, and Judge Byrnes was struck with an illness prior to trial, necessitating a transfer of the case to this Court.

This Court has had numerous hearings and an attempted trial through jury selection; there have been hearings on the competency of the Defendant. Finally, in August, 2004 a court trial was concluded and the Defendant found guilty.

The dates that were set aside for the sentencing hearing, November 15, 16 and 17, 2004, have been cleared by this Court, the various witnesses and the Assignment Office and will not be postponed.

We conclude that the court did not abuse its discretion because sound reasons existed for the decision.

The reasons offered by Appellant for the continuance of trial and sentencing, as he concedes, "boil down to absence of preparation." We reiterate what we stated in *Ware*, "[i]f Appellant is raising an ineffective assistance of counsel claim, it is more properly raised in post-conviction proceedings. *See Perry v. State*, 344 Md. 204, 227–28, 686 A.2d 274, 285 (1996)." *Ware*, 360 Md. at 706, 759 A.2d at 793–94. The primary reason for this rule is that, ordinarily, the trial record does not illuminate the basis for the challenged acts or omissions of counsel. *In re Parris W.*, 363 Md. 717, 726, 770 A.2d 202, 207 (2001) (citing *Johnson v. State*, 292 Md. 405, 434–35, 439 A.2d 542, 559 (1982)). We shall not disturb the exercise of the trial court's discretion on this record in the direct appeal.

4.

*Admission of Appellant's Statements at the Homicide Unit*

Appellant contends that the trial court committed error when it denied his motion to suppress all of the statements that he gave to police at the Homicide Unit between 3:42 a.m. and 5:10 a.m. on 4 December 2002, which were obtained without giving Appellant a *Miranda* warning, in violation of his Fifth Amendment right against self-incrimination. Appellant cites the following circumstances as evidence that Appellant was in custody at the time of his questioning by

police and so should have been issued a *Miranda* warning: it was the fourth time that he had been questioned in connection with Marciana's disappearance; he was isolated from Marciana's family and neighbor who were also questioned by the detectives; he was questioned in a station house; he had been in a small locked room at the Missing Persons Unit for two and one-half hours before being transported by police car to the Homicide Unit; police made him wait three hours at the Homicide Unit until they questioned him; the record is unclear whether he offered to go to the Homicide Unit; and that, because the detectives told Appellant that there were inconsistencies in his statements, that he was being questioned as a suspect and, as a result, a reasonable person in Appellant's position would have considered himself to be in custody.

The law presumes that, absent an appropriate rights warning, statements made during a custodial interrogation are made involuntarily and so are in violation of a defendant's right against self-incrimination. Therefore, when a person is held in custody, police are required to issue the so-called *Miranda* warning preceding the interrogation. *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966) ("Any statement given freely and voluntarily without any compelling influence is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated."). To determine whether Appellant was in custody when he was questioned by detectives at the Homicide Unit between 3:42 and 5:10 a.m. on 4 December 2002, the applicable standard is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *State v. Rucker*, 374 Md. 199, 209–210, 821 A.2d 439, 445 (2003) (citing *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279 (1983)). We apply this standard by considering the circumstances surrounding the interrogation. *Beheler*, 463 U.S. at 1125, 103 S.Ct. at 3520, 77 L.Ed.2d at 1279. As we said in *Whitfield v. State*, "some

actual indication of custody must exist, such that a reasonable person would feel he was not free to leave and break off police questioning." 287 Md. 124, 141, 411 A.2d 415, 425 (1980) (Citation omitted); *see also Rucker,* 374 Md. at 209, 821 A.2d at 445.[16]

After considering the circumstances surrounding Appellant's interrogation at the Homicide Unit, we hold that, while some circumstances hint at restraint or coercive elements, we are not prepared to conclude that they rise to the level that a reasonable person would feel that he or she were under arrest or his or her freedom of movement restrained to the degree associated with a formal arrest. That the questioning occurred in a police station is not determinative of whether a custodial interrogation occurred. In *Oregon v. Mathiason,* the U.S. Supreme Court held there was no custody and no deprivation of freedom when the defendant, a burglary suspect, came voluntarily to the police station at the request of the police, was told that he was not under arrest, although a suspect, and was permitted to leave at the end of the half-hour interview because the defendant was not deprived of his freedom of action in any significant way. 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977) (per curiam). The Court stated that a non-custodial interrogation is not converted merely because the questioning took place in a "coercive environment." *Id.*

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a

---

16. In *Whitfield,* we concluded that the defendant was in custody at the time of the interrogations at issue in that case. We considered there the following circumstances not found in the present case: defendant was interrogated in the "isolation wing" of the police station so as to be alone with his interrogators; he was the only inmate questioned; he was immediately confronted with law enforcement's knowledge of his guilt in order to shock the needed information from him; he was only permitted to leave the police station so that he could assist in retrieving the weapon; and, he was detained once he complied. *Whitfield,* 287 Md. 124, 141–42, 411 A.2d 415, 426 (1980).

.

crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."

*Id.*

In the present case, at no time during the questioning was Appellant arrested, nor do we believe that a reasonable person would be led to believe to the contrary. He was told that he may become a suspect. Although detectives made him aware of the inconsistencies in his statements and, in fact, obtained an admission from him to a lie about the time he left his workplace on the afternoon of 3 December, the record of the questioning reveals no coercion of the type the federal or Maryland constitutions prohibit. Nor does the record show that Appellant was coerced into being interviewed four times prior to his first interview at the Homicide Unit. Nor was he coerced into staying at the Missing Persons and Homicide Units for a total of 11 hours before the questioning at issue took place.[17] We find no indication from the circumstances of the interrogation that a reasonable person would not think that he or she could break off the police questioning and leave freely. Appellant agreed to go to the Missing Persons Unit. He agreed to answer police questions, and did so, as detectives testified, cooperatively. When answering questions at the first interview at the Homicide Unit, he did so cooperatively. He agreed to wait in the interview room, the door of which stood open throughout Appellant's time there. Appellant was taken to his mother's home the evening of 4 December 2002

---

**17.** Detectives offered Appellant pizza and soda (the record indicates he ate one slice and drank a soda), and, as police safety procedure provide, escorted him to the restroom when he wished to use it. The record does not disclose that the statements were elicited involuntarily from Appellant by use of physical actions employed by the police or their methods of interrogation.

after he terminated further questioning. We conclude that Appellant was not in custody or otherwise deprived of his freedom of action in any significant way during the relevant questioning by police before his arrest. We hold that the trial court committed no error in admitting Appellant's statements given without a prior *Miranda* warning.

5.

### Admission of Appellant's Clothing

Appellant argues that the trial court erred when it denied his motion to suppress the clothes obtained from him at the Homicide Unit, contending that he did not consent to the seizure. The State responds that Appellant voluntarily gave police the clothes, and, even if it were found that he did not, that the detectives properly effected a warrantless seizure due to the risk that any evidence of blood or other matter could be destroyed or removed. We conclude that Appellant consented to the search and seizure.

It is well settled that a warrantless search is per se unreasonable, subject only to a few specifically established and well-delineated exceptions, one of which is a search conducted pursuant to consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854, 858 (1973) (Citations omitted). When the State argues that a search was conducted pursuant to consent, it has the burden of proving that the consent, in fact, was given freely and voluntarily. *Schneckloth,* 412 U.S. at 222, 93 S.Ct. at 2045, 36 L.Ed.2d at 859. To determine whether the State met that burden, we consider the totality of the circumstances. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2048, 36 L.Ed.2d at 862–63; *Brown v. State,* 378 Md. 355, 362, 835 A.2d 1208, 1211 (2003).

Based upon our review of the totality of the circumstances surrounding the search and seizure of the clothes at the Homicide Unit, we conclude that the State satisfied its burden to prove that Appellant consented to the detectives' request for the clothes. For the reasons stated in Section III(A)(4),

*supra,* we determine that Appellant was not in custody at the time police obtained the clothing. In addition, the record exposes no evidence of coercion or force on the detectives' part in obtaining the clothing.

The detectives present in the interview room testified at the suppression hearing that Appellant allowed them to view the sewed-on label on his jeans and gave them the clothing by placing it on the table. Detective Patton stated that, after reviewing the blue jean paper labels recovered from the blue Wal-mart bag, he visited Appellant in the interview room to examine his jeans to determine their brand and size and observe whether other forensic evidence was on the jeans. Detective Patton, Detective Jones, and a crime lab technician went to the room where Appellant was waiting and "asked [Appellant] could we see his labels on his pants." When asked what Appellant's reaction was to this question, Detective Patton replied, "Sir, he didn't react at all. He stood up and unbuckled" and lowered his pants. The police took photographs of the tags. Observing that the brand and size of the jean pants matched the labels found in the Wal–Mart bag, Detective Patton then "asked [Appellant] to give us his clothing." As Appellant took off the jeans, Detective Patton noticed what appeared to be a smeared blood stain on a sock, and then asked for the remaining clothing. In response, Appellant took off his clothing and "laid them on the table" in front of him. Detective Jones' testimony was consistent with Detective Patton's testimony regarding the seizure of the clothing. The clothing requests occurred after Appellant's initial questioning (3:42 a.m. to 5:10 a.m.) and the subsequent polygraph test, when Appellant first was given a *Miranda* warning. After the clothing recovery, the detectives asked Appellant if he would talk to them again and, after issuing Appellant another *Miranda* warning, spoke with him for another thirty minutes before Appellant terminated the interview. Appellant, by his conduct, consented to the search and seizure of his clothing.

## 6.

### Admission of Fruits of the Car Search

Appellant perceives reversible error in the trial court's admission of the fruits of the search of Appellant's car because the warrant for the search was not supported by probable cause. Police sought the warrant to search Appellant's car after Detective Rabbit, of the Missing Persons Unit, questioned Appellant. Detective Rabbit offered the following averments in the affidavit in support of the search warrant:

On December 3, 2002 your affiant received a call for a missing person from Officer Petryseak [sic], 4C21. The missing child is identified as **Marciano** [sic] **Monia** [sic] **Ringo** (F/B/8 date of birth 5/2/1994). Your affiant's investigation under Baltimore Police Department Central Complain Number 02–4L01748, revealed that **Marciano Monia Ringo** was last seen in front of her school, which is located at 5201 Loch Raven Boulevard at 0735 hours (07:35 a.m.) this date. The missing child's mother, Milagro Wight [sic] (F/B/5/1977) advised that **Jamal** [sic] **Abeakuto** [sic] (M/B/12/1979) last saw the child, who left her apartment building to walk to school, Northwood Elementary School 5201 Loch Raven Boulevard. Milagro Wight advised that she contacted the school principal, who advised that **Marciano Monia Ringo** did not attend school on this date.

Your affiant was advised by Officer Petryseak that he spoke with the missing child's father, Marc Ringo. He advised Officer Petryseak that he went to 5300 Leith Road Apartment C to pick his son up and while at the location he asked **Jamal Abeakuto** about the location of **Marciano Monia Ringo.** Marc Ringo advised that **Jamal Abeakuto** told him that she walked to school.

**Jamal Abeakuto** advised Officer Petryseak that the child walked to school at 0735 hours and returned home at 0740 hours to get her homework signed. **Jamal Abeakuto** stated that he signed the homework and noticed that there was a note on the page concerning a filed trip to Port Discovery. **Jamal Abeakuto** stated that he drove **Marciano Monia**

**Ringo** in his car back to Northwood Elementary School and dropped her off in front of the school by the front doors. **Jamal Abeakuto** advised that there was a yellow school bus with children and teachers around them. **Jamal Abeakuto** advised that he did not see **Marciano Monia Ringo** enter the school because he drove through the alley in the odd side of the 5200 block of Loch Raven Boulevard.

Milagro Wight advised that when she spoke to the school principal, she was advised that **Marciano Monia Ringo** was not scheduled to go on a field trip today but rather on December 4, 2002.

The apartment building and surrounding areas were canvassed for **Marciano Monia Ringo;** however, she could not be located.

**Marciano Monia Ringo** was last seen wearing a pink Barbie fur coat, a white shirt, blue jeans and white and blue tennis shoes.

Police thereafter executed the warrant and searched the car, recovering several items that were later introduced in evidence at trial and sentencing, including the gun, which was introduced in the sentencing phase and the Wal-mart receipt, which was introduced in the State's case-in-chief at trial.

Appellant argues that the only support for the issuance of the search warrant was the fact that Appellant was the last person to have seen Marciana and that the situation presented by the averments in the affidavits an ordinary, everyday scenario—not suspicious circumstances that would constitute probable cause to search Appellant's vehicle. Although Appellant did not attack the warrant at the suppression hearing, the suppression court, *sua sponte,* found that the judge who issued the warrant had "plenty of probable cause to issue this warrant."

The State argues the issue was not preserved, contending that the validity of the search warrant was not presented to the suppression court by Appellant. Even if the issue were preserved, the State argues that the affidavit supported the issuing court's finding of probable cause.

 We conclude that the issue was preserved for appellant review, despite Appellant's failure to object at the suppression hearing, because the trial court made a finding, albeit gratuitously so, that the judge who issued the warrant "had plenty of probable cause." Based upon the averments submitted by Detective Rabbit in the affidavit, we determine that the issuing judge had probable cause to issue the warrant to search Appellant's car. The applicable standard of review of a probable cause determination is: "so long as the magistrate had a substantial basis for [ ] concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment [of the U.S. Constitution] requires no more." *Potts v. State,* 300 Md. 567, 571, 479 A.2d 1335, 1337–38 (1984) (Internal quotations and citations omitted). The finding of probable cause must ordinarily be shown within the four corners of the affidavit supporting it. *Valdez v. State,* 300 Md. 160, 168, 476 A.2d 1162, 1166 (1984). The affidavit supporting the warrant to search Appellant's car indicated that the last place Marciana had been seen was in Appellant's car and that Appellant had dropped Marciana off at school. The affidavit also indicated that Marciana did not attend school that day. The affidavit notes another inconsistency in Appellant's statements that raised suspicion: Appellant had told the detective that he had seen a note for a field trip scheduled to take place that day (3 December 2002), but Ms. White told the detective that the school principal had told her that the field trip was scheduled for 4 December. We therefore conclude that the suppression court committed no error by admitting the fruits of the car search.

## B.

### *Sentencing Phase Issues*

### 1.

### *Waiver of Jury at Sentencing*

 Appellant contends that the record fails to establish a knowing and voluntary waiver of jury sentencing. The cir-

cumstances pointed to by Appellant in support of his argument are: the lack of questioning for the purpose of assuring the court of the absence of threats, promises, or inducements; the lack of questioning as to Appellant's mental health; defense counsel's urging of a court trial, rather than a jury trial; and Appellant's poor mental state at the time of the sentencing waiver colloquy because it occurred immediately after the court's finding of Appellant's guilt. Appellant also argues that the court's description of jury deliberation in a sentencing proceeding as incomplete, confusing, and inaccurate to a point where it could have induced Appellant to reject the option of a jury sentencing.

In response, the State argues that the record of the trial court's inquiry supports its acceptance of the waiver as voluntary and knowing. The State contends that the inquiry conducted here was comparable to the inquiry and jury sentencing waiver in *Baker v. State,* 367 Md. 648, 790 A.2d 629 (2002) and *Thanos v. State,* 330 Md. 77, 622 A.2d 727 (1993), and "shows that Abeokuto, an educated man, possessed sufficient knowledge of his jury sentencing right and understood what he was doing in waiving that right." Moreover, the State urges that, Appellant's waiver of jury sentencing should be viewed in light of this previous waiver of jury trial. In addition, the State asserts that the trial court bestowed upon Appellant comprehensive and accurate advice on his right to jury sentencing. The State notes that Appellant's election of a court sentencing arose from his discussions with his defense counsel.

Immediately after the guilt findings by the trial judge, the prosecutor, with the consent of defense counsel, offered a written version of an advisement of rights litany to be used by the trial judge.[18] The trial court accepted the proposal, read

18. The prosecutor offered the written version of the litany, stating:

Your Honor, prior to getting—to putting the Defendant's election on sentencing, I have an—I have a request, and I would file this pleading, that there is a litany that I would ask the Court to read to the Defendant. The state would file this at this time, to go over to

aloud the litany, and, at the end of the relatively lengthy recitation, asked a few questions of Appellant, which questions also were part of the offered litany. The colloquy between the court and Appellant was as follows:

COURT: Mr. Abeokuto, we have now concluded the guilt phase of your trial and you have been convicted of murder in the first degree.

The next phase of your trial is the sentencing phase at which it will decided whether the sentence to be imposed on the murder conviction shall be death, life without parole, or life imprisonment.

Your trial was conducted before the Judge sitting without a jury. You are not obliged to maintain that same election for sentencing, however, because you were tried by the Judge, if you elect to be sentenced by a jury, you will be sentenced by a jury that is selected for the purpose of sentencing you.

A jury is comprised of twelve citizens selected from the voter rolls and motor vehicle rolls of this jurisdiction. You, with our attorney, would have an opportunity to examine all potential jurors as part of the process of selecting twelve jurors. If a potential juror holds a belief either for or against capital punishment which would prevent or substantially impair him or her from being impartial, that juror would not be allowed to serve as a juror in this case.

In order to secure a death sentence, it is the obligation of the State of Maryland to prove beyond a reasonable doubt that you were a principal in the first degree to the murder, that is, the murder was committed by your own hand and

---

make sure that the election of sentencing is based on solely the Defendant's decision without being influenced by anything the Court may have done or said that may—especially under the [sic] what happened in the *Tichnell* case and Defendant's election of a specific sentencer one way or the other.

I would ask the Court ... [to] go over this litany with the Defendant and that the, just to make this clear for the record in terms of Defendant's election.

that one or both of the aggravating circumstances listed in the notice of intent to seek a death penalty exists.

The same burden of proof and standard of proof beyond a reasonable doubt exists regardless of whether you elect to be sentenced by the Court or by a jury. If you elect to be sentenced by a jury, each of these threshold determinations must be unanimous, that is, all of the jurors must agree upon. If the sentencer, whether Court or jury, finds that the State has satisfied its burden, the sentencer will go on to consider whether any mitigating circumstances exist.

Mitigating circumstances are any circumstances relating either to yourself or this crime that would tend to make a sentence of death less appropriate. The statute lists seven circumstances that are considered to be mitigating. To be considered there must be proof of the existence of any of these circumstances by a preponderance of the evidence. This burden exists whether the sentencer is the Court or the jury.

The statutory mitigating circumstances that the jury must consider are these:

One, the Defendant has not previously been found guilty of a crime of violence, entered a plea of guilty or nolo contendere to a charge of a crime of violence, or have a judgment of probation or a stay of entry of judgment entered on a charge of crime of violence.

Crime of violence as used in the statute means abduction, arson, escape, kidnapping, manslaughter, except involuntary manslaughter, mayhem, murder, robbery, or rape or sexual offense in the first or second degree, or any attempt to commit any of these offenses or the use of handguns in the commission of a felony or other crime of violence.

Number two, the victim was a participant in the Defendant's conduct or consented to the act which caused the victim's death.

Number three, the Defendant acted under substantial duress, domination or provocation of another person, but

not so substantial as to constitute a complete defense to the prosecution.

Number 4, the murder was committed while the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental incapacity, mental disorder, or emotional disturbance.

Number 5, the youthful age of the Defendant at the time of the crime.

Number 6, the act of the Defendant was not the sole proximate cause of the victim's death.

And, number 7, it is unlikely that the Defendant will engage in further criminal activity that would constitute a continuing threat to society.

In addition to the seven listed mitigating circumstances, the sentencer may write down any other fact or circumstance it finds to be mitigating. That is anything about you or the trial that would make a sentence of death less appropriate. This includes anything relating to your background as well as your relevant and material conduct up to and including this sentencing proceeding, as well as any factor causing one to feel sympathy or mercy toward you.

Mercy in and of itself may be considered a mitigating circumstance.

Again, mitigating circumstances must exist by a preponderance of the evidence.

Further, with respect to nonstatutory mitigating factors, it is necessary, too, that the sentencer be convinced both of the fact or circumstance exists and that it is mitigating. As with the listed mitigating circumstances, this is the same whether the sentencer is the Court or a jury.

Unlike the matters on which the State bears the burden of proof, if you elect to be sentenced by a jury, the jury need not be unanimous with respect to whether a particular mitigating circumstance exists other than mitigating circumstance number one, which they must unanimously find.

This is true as to both the listed mitigating circumstances and the other mitigating circumstances.

If after a period of deliberation the sentencing jury cannot unanimously agree on the existence of a particular mitigating circumstance, those jurors finding the mitigating circumstance will be instructed to consider it in determining the appropriate sentence. Those jurors finding that the mitigating circumstance does not exist will not consider it. If all of the jurors agree that no mitigating circumstance has been proven, they will be instructed to enter a sentence of death.

Similarly, if the Court, sitting without a jury, would find that no mitigating circumstance exists, the Court would also enter a sentence of death.

If the Court or any juror finds that one or more mitigating circumstances has been proven, the Court or jury will balance those mitigating circumstances, if found to exist, against the aggravating circumstance that has been proven beyond a reasonable doubt to determine whether the sentence should be death or not death. The same balancing process is undertaken by a jury or the Court.

In the event of a jury sentencing, all jurors will balance the mitigating circumstances unanimously found to exist and each individual juror will balance as well mitigating circumstances found by that juror to exist.

Whether the sentencer is the Court or a jury, the State bears the ultimate burden to establish the propriety of a death sentence.

If the sentencer, is the court or jury, the State bears the ultimate burden to establish the propriety of a death sentence.

If the sentencer, whether court or jury, concludes that the mitigating circumstances outweigh the aggravating circumstances, the sentence may not be death.

If the mitigating circumstances and aggravating circumstances are in even balance, the sentence may not be death. Only if the aggravating circumstances outweigh the mitigat-

ing circumstances is a sentence of death to be imposed. Where the sentencer is a jury, the outcome of the balance must be a unanimous conclusion of the jury.

The need for jury unanimity has been noted on several occasions. If after a reasonable period of deliberation the jury is unable to reach agreement unanimously on any matter for which unanimity is required, including whether a sentence of death should be imposed, then the Court shall not impose a sentence of death.

If the sentencer determines that the sentence shall not be death, then the same sentencer shall proceed to determine whether the sentence should be life or life without parole.

If the sentencer is a jury and they aren't able to reach a verdict on the issue of death within a reasonable period of time, then the sentence of death shall not be imposed and the same jury shall nevertheless proceed to consider the question of life or life without parole. If the sentencer is a jury, a sentence of life without parole must be a unanimous decision.

If the jury cannot achieve unanimity on the issue of life without the possibility of parole after a reasonable period of deliberation, the sentence of life must be imposed.

If you choose the Court as the sentencer, then I must consider whether life or life without parole is appropriate if I determine that death is not the proper sentence.

Do you have any questions concerning what I have described and read to you in these instructions?

DEFENDANT: No.

COURT: Have you had an opportunity to discuss your election with your attorney, [defense counsel]?

DEFENDANT: Yes.

COURT. Do you understand the various distinctions that I have outlined for you?

DEFENDANT: Yes.

COURT: What is your age?

DEFENDANT: 24

COURT: What is your educational background?

DEFENDANT: Some college.

COURT: What is your election for sentencing, to be sentenced by the Court or to be sentenced by the jury?

DEFENDANT: Court.

COURT: Any other questions, [defense counsel] or [prosecutor]?

DEFENSE COUNSEL: No, not from the defense. No.

COURT: [Prosecutors]?

PROSECUTOR: No, Your Honor.

COURT: Mr. Clerk, would you file the election read and file this as Motions Exhibit Number 1—Court's Exhibit Number 1.

According to the election, the court proceeded to sentence Appellant. It conferred, among other sentences, the sentence of death for the murder conviction.

■■■■■■ The right to a jury at a capital sentencing is a creature of statute. *Bruce v. State*, 328 Md. 594, 602, 616 A.2d 392, 396 (1992). A capital sentencing hearing shall be conducted before a jury unless the defendant waives the jury. Md.Code (2002, 2003 Repl.Vol., 2004 Supp.) Criminal Law Article, § 2–303(c)(3); *Baker*, 367 Md. at 690, 790 A.2d at 654 (citing the predecessor statute to § 2–303). A defendant's waiver must be knowing and voluntary. *Baker*, 367 Md. at 690, 790 A.2d at 654 (Citation omitted); *Trimble v. State*, 321 Md. 248, 262, 582 A.2d 794, 801 (1990).[19] When examining whether a defendant made a knowing and voluntary waiver, the court considers the totality of the circumstances, including

---

**19.** In *Ware v. State*, we stated that "[w]hether a defendant is to be sentenced by the court or the jury is a decision for the defendant." 360 Md. 650, 704, 759 A.2d 764, 792 (2000) (citing Md. Rule 4–246 (waiver of jury trial); *Gilliam v. State*, 331 Md. 651, 670, 629 A.2d 685, 694 (1993); and *Bruce*, 328 Md. at 602–07, 616 A.2d at 396–98). We held, in *Ware*, that a defendant's "decision to proceed with jury sentencing in light of defense counsel's recommendation to the contrary is insufficient in and of itself to trigger a competency examination." *Ware*, 360 Md. at 706, 759 A.2d at 793.

the court's colloquy with the defendant. *Baker*, 367 Md. at 690–91, 790 A.2d at 654. We determine whether the court's explanation of the jury sentencing right is proper. *Id.; Trimble*, 321 Md. at 262–63, 582 A.2d at 801; *Harris v. State*, 295 Md. 329, 339–40, 455 A.2d 979, 984 (1983). We also determine whether the court made an effort to ensure that the defendant's waiver was knowing and voluntary by considering the adequacy of the court's inquiry into voluntariness based upon the facts and issues presented to the court. We base our conclusion on the record provided. *Baker*, 367 Md. at 691, 790 A.2d at 654.

When determining whether a trial court properly instructed a defendant, we consider the accuracy and clarity of the court's statement of the law and whether the defendant had sufficient time to discuss the election with defense counsel prior to the court's inquiry. In *Baker*, Baker argued that his waiver of jury sentencing was not knowing and intelligent. *Baker*, 367 Md. at 690–91, 790 A.2d at 654–55. He contended that the court failed to mention the standard of proof applicable to the balancing of aggravating and mitigating circumstances and erred in stating that the jury's finding at trial that Baker was a principal in the first degree was binding at sentencing.[20] *Baker*, 367 Md. at 690, 790 A.2d at 654. We examined the waiver colloquy between the trial court and Baker, considered the totality of the circumstances, and concluded the waiver knowing and voluntary because the "record reflect[ed] that the trial court made a thorough and reasonable effort to explain the sentencing proceeding to Baker and [made] sure that his waiver was knowing and voluntary." *Baker*, 367 Md. at 691, 790 A.2d. at 654. We stated:

The trial court asked Baker and his counsel several times if they had been able to adequately discuss the question of

---

**20.** Baker also argued that the trial court did not properly advise him of the balancing of aggravating circumstances and mitigating circumstances, relying on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). We held, in *Baker*, that *Apprendi* is not applicable to Maryland's death penalty statute. *Baker*, 367 Md. at 691, 790 A.2d at 654.

whether to be sentenced by the court or a jury. Baker's attorneys were also asked if the court had adequately covered the advisements and they responded that the court had. Baker also stated [several times] that he did not have any questions, that he had a sufficient opportunity to discuss the election with his attorneys, and that he did not have any questions that his attorneys were unable to answer. Baker also responded that he was satisfied making his election at that time, that he understood that he could not change his mind, and that he did not need to have further time to discuss the election with his attorneys. *Baker*, 367 Md. at 691, 790 A.2d at 654–55. Although we found no facts in *Baker* that would call into question the defendant's mental or medication status at the time that would suggest that the trial judge should ask about them in the inquiry, the court asked Baker whether he was under the influence of any medication, or drugs, or alcohol that would affect his ability to understand the court's instructions, hear the court's questions, or answer the court's questions. *Baker*, 367 Md. at 662, 790 A.2d at 637–38. Baker replied that he did not. *Id.* The court also asked about his age and level of education. *Id.* The court characterized the standard of proof applicable to the balancing of aggravating and mitigating circumstances as "outweighing," rather than characterizing it as the "preponderance standard." *Baker*, 367 Md. at 660, 790 A.2d at 636. We concluded that this instruction, although somewhat ambiguous, did not rise to the level that it would dramatically increase the chance that Baker would choose to be sentenced by the court, rather than a jury. *Baker*, 367 Md. at 693, 790 A.2d. at 656. Thus, because the court's inquiry into the voluntariness of the election and the adequate instructions given by the court supplied the requisite knowledge concerning the election, we concluded the jury sentencing waiver to be valid.

We engaged in the same analysis in *Trimble, supra.* In that case, we vacated a sentence of death because, during the colloquy by the court at the time of the jury sentencing waiver, the trial judge told Trimble that he "had the authori-

ty" to dismiss the jury (if it could not decide on a sentence within a reasonable time) and impose a life sentence, a statement which may have caused Trimble to believe that he had nothing to lose by electing to be sentenced by the court. *Trimble*, 321 Md. at 262–63, 582 A.2d at 801 (citing as controlling *Harris v. State*, 295 Md. 329, 455 A.2d 979 (1983) (holding that the defendant's waiver of jury sentencing was not knowing and voluntary because the court failed to instruct Harris that the jury would have to be unanimous before imposing death)). Because of the inaccuracy of the court's instruction, we vacated Trimble's death sentence even though he was represented by counsel at the time of the election.[21]

In *Thanos v. State*, 330 Md. 77, 622 A.2d 727 (1993), we considered evidence of the voluntariness of the jury sentencing waiver, which we found to be knowing and voluntary. Rejecting Thanos' claim that the trial court erred in explaining his right to be tried and sentenced by a jury, we determined that his arguments were "merely extensions of his [actual] claim that he was incompetent to stand trial." *Thanos*, 330 Md. at 94, 622 A.2d at 735. We found the incompetency claim to be devoid of merit because:

> None of Thanos's four expert witnesses at the sentencing proceeding ever suggested that he was incompetent to stand trial. While Thanos did make some peculiar remarks to the trial judge, his words on the whole were very lucid. He appeared to grasp all of his rights as they arose throughout the proceedings. He explained very clearly why he preferred conditions in the Super Max facility in Baltimore to those of the St. Mary's County Detention Center[, the reason he offered for preferring a court trial to a jury trial]. And he understood and insightfully articulated his tendency

---

**21.** While the presence of an attorney to discuss the waiver election tends to show that a defendant has made a knowing waiver, *see Baker*, that fact will not mitigate an inaccurate or incomplete court instruction on the jury sentencing right, *see Trimble* and *Harris*. Therefore, evidence that a defendant discussed the election with an attorney prior to the waiver is only one circumstance for us to consider when determining whether a waiver is voluntary and knowing.

to become disruptive under stress, which reasonably justified his initial desire to absent himself from the proceedings. *Thanos,* 330 Md. at 86, 622 A.2d at 731. The record indicated that Thanos was "lucid," "insightfully articulate[ ]," and "appeared to grasp all of his rights" as demonstrated by his statements during the proceedings and his responses to the court's questions. Thus, the record supported the trial court's finding of a voluntary waiver.

After an examination of the totality of the circumstances on the record of the present case, we are unable to conclude with requisite confidence that Appellant made a knowing and voluntary waiver of a jury sentencing. Our confidence in the waiver is undermined because the trial court knew (or should have recalled) from testimony given at the competency hearing on 22 June 2004 that Appellant had been prescribed Geodon (an anti-psychotic medication) while in custody at the County Detention Center. The court failed at the sentencing waiver hearing to ascertain whether Appellant had been taking the medication since the competency determination; whether he currently was taking the medication; and, if so, whether Appellant was experiencing any side effects as alluded to by Dr. Inouye, at least insofar as they might impact adversely his ability to make a knowing and voluntary waiver some nine weeks after the competency determination. This line of inquiry, under the facts of the case, was important because Geodon ingestion may give rise to the side effects, among others, of sedation, nausea, dizziness, and confusion. PHYSICIANS' DESK REFERENCE 2517–20 (60 ed.2006); *see also Facts About Geodon, available at* http://www.geodon.co m/GeoPat_FactGeo_sid e_effects.asp (providing product information by the manufacturer, Pfizer Inc.); *Geodon, Physicians' Desk Reference,* 2005 WL 1158531 (2005) (providing information on common side effects by the *Physicians' Desk Reference,* current through the printing of the 2005 edition). The effect of the failure to make a specific inquiry on this point in the jury sentencing waiver is distinguishable from the absence of a similar inquiry during the jury trial waiver process because, in the latter, the court heard contemporaneous expert

medical testimony regarding Appellant's competency to stand trial, which included learning of the prescription of Geodon, *see supra* Section III(A)(1). Thus, the information was fresh in the court's mind as it evaluated the waiver proceedings before it then. The jury sentencing waiver election, however, took place on 27 August 2004, nearly nine weeks after the court last heard testimony regarding Appellant's medication status. As Dr. Inouye stated at the competency hearing on 22 June 2004, the positive effects, if any, of Geodon may take "weeks" to display themselves. Whether the potential adverse side effects, if any, take as long to materialize is unexplored on this record, particularly so at the jury sentencing waiver proceeding.

 We do not hold, by finding this jury sentencing waiver colloquy insufficient to support a knowing and voluntary waiver, that every jury sentencing waiver colloquy must inquire into mental health and medication. As stated before, we do not require a specific or standard litany or colloquy in every case.[22] The necessary inquiry by the court to determine whether a jury sentencing waiver is knowing and voluntary is bound by the facts and circumstances of the particular case. Here, the trial court knew from the competency hearing that Appellant had been prescribed Geodon, an anti-psychotic drug that, not surprisingly, carries with it relevant potential side effects—information that easily could be found in the *Physician's Desk Reference*.[23]

---

**22.** Appellant also argues that the court erred because it did not make an explicit finding of a voluntary and knowing waiver. It is unnecessary for us to reach this question.

**23.** For guidance to the trial court on remand, we choose to comment on a collateral point regarding the waiver litany employed by the court. The court read aloud a five page description of Appellant's rights and sentencing standards before asking Appellant whether he understood them. This could be a rather daunting explication to a layman, even one not possibly on an anti-psychotic medication. In contrast, the court, prosecutor, and defense counsel inquired about Appellant's understanding of his various rights seven times at the jury trial waiver election. Although the court's explanation of jury sentencing rights was accurate and clear, it might be a better approach to present such

Because we vacate the sentences due to a finding of fault with the sentencing proceeding by four members of the Court, it is not-strictly necessary that we reach and decide the other preserved issues regarding sentencing. We nonetheless choose to offer some dicta guidance, however, on a few of them in order that, on remand, the trial court may consider that guidance should the circumstances recur at a new sentencing proceeding, as it seems to us they likely will.

2.

*Sentence for Extortion*

Had we not vacated the entire sentencing proceeding for the failure of the jury waiver, we would have concluded that the Circuit Court illegally increased the sentence for the extortion conviction by changing the sentence that it first imposed at the sentencing hearing to an increased one in an Amended Commitment Order. At the sentencing hearing on 15 November 2004, the sentence for extortion was imposed as follows:

> COURT: As to the extortion count, the sentence of the Court is ten years in the Department of Correction, and that sentence will date from the initial date of his arrest, which was that?
>
> PROSECUTOR: 12–24 of—actually it was—yes, 12–24 of 02.
>
> COURT: 12–24–02. Okay.

The Amended Commitment Report prepared thereafter provided that the sentence for the extortion conviction was ten years to be served consecutive to the sentence of death for the first-degree murder conviction. In the post-sentencing Report of Trial Judge, prepared in capital cases pursuant to Md. Rule 4–343, the court re-affirmed its intent that the sentence

---

information to defendants in smaller intellectual "bytes" and inquire discretely after each "byte" or logical grouping of "bytes" whether a defendant understands them.

for extortion be ten years to be served consecutively with the sentence of death for the first-degree murder conviction.

Md. Rule 4–345 (2004) provides, in pertinent part:

(a) **Illegal sentence.** The court may correct an illegal sentence at any time.

(b) Modification or reduction—Time for. The court has revisory power and control over a sentence upon a motion filed within 90 days after its imposition . . . (2) in a circuit court, whether or not an appeal has been filed. Thereafter, the court has revisory power and control over the sentence in case of fraud, mistake, or irregularity, or as provided in section (e) of this Rule. *The court may not increase a sentence after the sentence has been imposed,* except that it may correct an evident mistake in the announcement of a sentence if the correction is made on the record before the defendant leaves the courtroom following the sentencing proceeding.

\* \* \*

(d) **Open court hearing.** The court may modify, reduce, correct, or vacate a sentence only on the record in open court, after hearing from the defendant, the State, and from each victim or victim's representative who requests an opportunity to be heard. . . . (Emphasis added).

In the present case, the trial court initially imposed the sentence for extortion to begin on 24 December 2002 and then purported in subsequent papers to change it to consecutive with the death sentence, which effected an increase (albeit potentially a metaphysical one) in the sentence. This was not permitted.

3.

*Separate Sentences for Kidnapping and Child Kidnapping*

The doctrine of merger of offenses for sentencing purposes is premised in part on the Double Jeopardy Clause of the Fifth Amendment of the U.S. Constitution, applicable to state court proceedings via the Fourteenth Amendment. *Dix-*

*on v. State*, 364 Md. 209, 236, 772 A.2d 283, 299 (2001) (Citations omitted). The applicable standard for determining whether one offense merges into another is what is often called the "required evidence test," *McGrath v. State*, 356 Md. 20, 23, 736 A.2d 1067, 1068–69 (1999) (Citations omitted); but, it is also known as the "same evidence test," "Blockburger test," or "elements test." *Dixon*, 364 Md. at 237, 772 A.2d at 299–300. In *McGrath*, *supra*, we summarized the required evidence test as follows:

> The required evidence test focuses upon the elements of each offense; if all of the elements of one offense are included in the other offense, so that only the latter offense contains a distinct element or distinct elements, the former merges into the latter. Stated another way, the required evidence is that which is minimally necessary to secure a conviction for each [ ] offense. If each offense requires proof of a fact which the other does not, or in other words, if each offense contains an element which the other does not, there is no merger under the required evidence test even though both offenses are based upon the same act or acts. But, where only one offense requires proof of an additional fact, so that all elements of one offense are present in the other, and where both offenses are based on the same act or acts, [ ] merger follows [ ].

> * * *

> When applying the required evidence test to multi-purpose offenses, *i.e.*, offenses having alternative elements, a court must examine the alternative elements relevant to the case at issue. (Internal quotations and citations omitted).

*McGrath*, 356 Md. at 23–24, 736 A.2d at 1068–69 (quoting *State v. Lancaster*, 332 Md. 385, 391–392, 631 A.2d 453, 456–57 (1993)). When a merger is required, separate sentences are normally precluded; instead, a sentence may be imposed only for the offense having the additional element or elements. *See, e.g., Dixon*, 364 Md. at 237, 772 A.2d at 299 (citing *Nightingale v. State*, 312 Md. 699, 702, 542 A.2d 373, 374 (1988)); *McGrath*, 356 Md. at 24, 736 A.2d at 1069 (Internal

quotations omitted). "[W]here there is a merger of a lesser included offense into a greater offense, we are not concerned with penalties—the lesser included offense generally merges into and is *subsumed* by the greater offense regardless of penalties." *Dixon,* 364 Md. at 238, 772 A.2d at 300 (citing *Spitzinger v. State,* 340 Md. 114, 125, 665 A.2d 685, 690 (1995) and *Simms v. State,* 288 Md. 712, 722–23, 421 A.2d 957, 963 (1980)) (Emphasis in original); *see also State v. Lancaster,* 332 Md. at 404–07, 631 A.2d at 463–64.

We have not before determined whether kidnapping merges with child kidnapping. We would examine first the elements of each offense, regardless of the penalties imposed. Section 3–502 of the Criminal Law Article regarding kidnapping provides, in pertinent part:

(a) *Prohibited.*—A person may not, by force or fraud, carry or cause a person to be carried in or outside the State with the intent to have the person carried or concealed in or outside the State.

Md.Code (2002), Criminal Law Article, § 3–502(a). Section 3–503 of the Criminal Law Article regarding child kidnapping, as it stood in 2002, provided, in pertinent part:

(a) *Prohibited.*—(1) A person may not, without color of right:

(i) forcibly abduct, take, or carry away a child under the age of 12 years from:

1. the home or usual place of abode of the child; or

2. the custody and control of the child's parent or legal guardian;

(ii) without the consent of the child's parent or legal guardian, persuade or entice a child under the age of 12 years from:

1. the child's home or usual place of abode; or

2. The custody and control of the child's parent or legal guardian; or

(iii) with the intent of depriving the child's parent or legal guardian, or any person lawfully possessing the child, of the

custody, care, and control of the child, knowingly secrete or harbor a child under the age of 12 years.

Md.Code (2002), Criminal Law Article, § 3–503(a).

Appellant was convicted of one count of statutory kidnapping (according to the Indictment: "unlawfully did forcibly and fraudulently carry and cause to be carried Marciana Monyai Ringo, with intent to have [her] carried and concealed in or outside this State . . .") and one count of statutory child kidnapping (according to the Indictment: "unlawfully did, without color of right, without the consent of Marciana Monyai Ringo's parent or legal guardian, persuade and entice [her], a child under the age of 12, from [her] home and the custody and control of [her] parent or legal guardian . . .").

Because both kidnapping and child kidnapping are multi-element offenses, we look to the alternative elements relevant to the present case. *See, e.g., Dixon,* 364 Md. at 243, 772 A.2d at 303. The elements of kidnapping relevant here are: (1) forcibly or fraudulently (2) carry or cause to be carried (3) a person (4) with the intent to have the person carried or concealed in or outside the State. The elements of child kidnapping relevant here are: (1) without the consent of the child's parent or legal guardian, (2) persuade or entice (3) a child under the age of 12 years (4) from the child's home custody or control of the child's parent or legal guardian. A relevant element of kidnapping not present in the relevant elements of child kidnapping is force or fraud. To commit child kidnapping, one need only persuade or entice the child; force or fraud is not required. A relevant element of child kidnapping not present in the relevant elements of kidnapping is the age of the victim as twelve or younger. To commit kidnapping, the victim may be any age. Therefore, the trial court here was not required to merge the two convictions for sentencing purposes under the required elements test.

The required evidence test is not, as we pointed out in *McGrath,* 356 Md. at 25, 736 A.2d at 1069 and *Monoker v. State,* 321 Md. 214, 222, 582 A.2d 525, 529 (1990), the only standard under Maryland law for determining questions of merger, even when two sentences are not required to be

merged under the required evidence test. Those sentences might still require merger under either the rule of lenity and/or principles of fundamental fairness. The rule of lenity, which is only applicable to statutory offenses, provides that "where there is no indication that the [L]egislature intended multiple punishments for the same act, a court will not impose multiple punishments but will, for sentencing purposes, merge one offense into the other." *McGrath,* 356 Md. at 25, 736 A.2d at 1069 (citing *Miles v. State,* 349 Md. 215, 227, 707 A.2d 841, 847 (1998), *Williams v. State,* 323 Md. 312, 321–22, 593 A.2d 671, 675 (1991), *Monoker,* 321 Md. at 220, 582 A.2d at 527–28, and *White v. State,* 318 Md. 740, 745–46, 569 A.2d 1271, 1274 (1990)). We explained the purpose of the rule of lenity in *Monoker:*

> The rule of lenity was originally formulated by the United States Supreme Court as a principle of statutory construction. The policy behind the rule is " 'that the Court will not interpret a . . . criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what [the legislature] intended.' " *White v. State,* 318 Md. at 744, 569 A.2d 1271, quoting *Simpson v. U.S.,* 435 U.S. 6, 15, 98 S.Ct. 909, 914, 55 L.Ed.2d 70 (1978), which in turn quotes *Ladner v. U.S.,* 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958).

*Monoker,* 321 Md. at 222–23, 582 A.2d at 529. Where "there is a merger under the rule of lenity, the offense carrying the lesser maximum penalty ordinarily merges into the offense carrying the greater maximum penalty." *McGrath,* 356 Md. at 25, 736 A.2d at 1069 (quoting *Miles,* 349 Md. at 229, 707 A.2d at 848). We conclude that the rule of lenity would be applicable to the operative considerations in the present case. In reaching this view, we consider the Legislature's chosen statutory language and evidence, if any, of legislative intent regarding multiple sentences for the same criminal conduct.[24]

---

**24.** According to the Indictment, the State charged Appellant for violation of two statutory offenses under §§ 3–502 and 3–503(a)(1)(ii).

The history of the kidnapping and child kidnapping statutes has been summarized aptly in *Moore v. State*, 23 Md.App. 540, 329 A.2d 48 (1974), *cert. denied*, 274 Md. 730 (1975). The common law of kidnapping prohibited the forcible abduction or stealing away of a man, woman, or child from their own country to another, a capital crime under Jewish law. *Moore*, 23 Md.App. at 543, 329 A.2d at 50 (citing W. BLACKSTONE, COMMENTARIES, 219). The first alternation to the common law definition of kidnapping occurred as a result of a law enacted in 1809, which required as an element the carrying of "any free person," or causing him or her be carried, out of this state. Chapter cxxxviii, § 4 of the Acts of 1809.[25] In 1819, the Legislature enacted a statute entitled, "An Act to punish the offence of Kidnapping White Children." Chapter cxxxii of the Acts of 1819. The statute provided:

*Be it enacted, by the General Assembly of Maryland,* That every person, his or her counsellors, aiders or abettors, who shall be duly convicted of kidnapping, and forcibly or fraudulently stealing, taking or carrying away, any white child or children under the age of sixteen years, shall be sentenced to undergo a confinement in the penitentiary for a period of time not less than five years, nor more than twelve years, there to be treated as the law directs.

Chapter cxxxii of the Acts of 1819. The penalty under this statute provided for a sentence between five and twelve years. The kidnapping statute in effect in 1819 provided a sentence

---

**25.** The first enacted version of the common law crime of kidnapping provided:

Every person, his or her counsellors, aiders or abettors, who shall be duly convicted of the crime of kidnapping, and forcibly or fraudulently carrying, or causing to be carried out of this state, any free person, or any person entitled to freedom at or of after a certain age, period or contingency, or of arresting and imprisoning any free person, or any person entitled to freedom at or after a certain age, period or contingency, knowing such person to be free, or entitled to their freedom, as aforesaid, with intent to have such person carried out of this state, shall be sentenced to undergo a confinement in the penitentiary house for a period of time not less than two nor more than ten years to be treated as the law directs.

Chapter cxxxviii, § 4 of the Acts of 1809.

between two and five years. The racial aspect of the child kidnapping law was deleted in 1888. Md.Code (1888), Article 27, § 155. The Court of Special Appeals determined that the legislative intent behind the enactment of the first child kidnapping statute "was to create a special statute for the protection of children and to proscribe the forcible or fraudulent taking or carrying away of a child from his or her parent, custodian, or guardian regardless of whether the child was asported beyond the territorial confines of Maryland," a measure taken by the Legislature because the kidnapping statute at the time required that the victim be carried outside of the State. *Moore*, 23 Md.App. at 546–47, 329 A.2d at 52. In 1949, the Legislature amended the kidnapping statute to include asportation both outside and within the State. Chapter iv, § 385 of the Acts of 1949.

Now that neither the kidnapping statute nor the child kidnapping statute require that a victim be asported beyond the territorial confines of Maryland, the original legislative intent to create a special statute to protect children from being kidnapped and carried away to a place within the State is appeased. The current version of the child kidnapping law differs from the kidnapping law in other respects. As we noted, *supra*, under § 3–503, child kidnapping may be committed by circumstances that are not covered by the current general kidnapping statute, § 3–502, and vice versa.[26] Thus, it appears that the Legislature intended to create two separate offenses, each with its own penalty. Nonetheless the statutory language and legislative history are silent as to the legislative intent to punish the two offenses as distinct offenses, or a single merged crime, when a defendant violates both § 3–503

---

**26.** Indeed, the child kidnapping law presented a broader definition of criminal conduct than kidnapping, even after the kidnapping law was first amended to no longer require asportation out of the State. *Compare* Chapter 589, § 317 of the Acts of 1933 (providing that child kidnapping requires "forcibly or fraudulently *stealing, taking* or carrying away any child under the age of sixteen years ...") (Emphasis added) *with* Chapter 589, § 316 of the Acts of 1933 (providing that kidnapping requires "forcibly or fraudulently carrying or causing to be carried out of or within this State any person ...").

and § 3–502 by the same conduct. Therefore, the rule of lenity applies. As a result of the ambiguity, "we, in effect, will give the defendant the benefit of the doubt and [would] hold that the crimes do merge." *Monoker,* 321 Md. at 222, 582 A.2d at 529 (Citations omitted). The trial court erred when it failed to merge the kidnapping and child kidnapping counts into one sentence of thirty years.

### 4.

*Unpreserved Sentencing Issues:*

*Admission of Medical Expert's Testimony, Victim Impact Testimony, and the Prosecutorial Closing Statement at the Sentencing Hearing*

Appellant raises three unpreserved issues regarding his sentencing. *See supra* questions presented numbers (9), (10), and (11). In light of the effect of our holding as to the invalid jury sentencing waiver, it is unnecessary for us to address these issues in any event, but we choose to note that, if the questions were before us, we would not review these claims because the unpreserved appellate arguments of error cannot be characterized as compelling, exceptional, or fundamental to assure the defendant a fair sentencing, after applying the plain error doctrine. *See supra* Section III(A)(2).

### 5.

*Constitutionality of the Maryland Death Penalty Statute*

Appellant argues that the Maryland death penalty statute is unconstitutional because it requires that aggravating circumstances outweigh mitigating circumstances only by a preponderance of the evidence. Appellant's argument fails. "We have consistently found no due process violation in the provision directing that the weighing process be based on a preponderance of the evidence." *Oken v. State,* 378 Md. 179, 253, 835 A.2d 1105, 1148 (2003), *cert. denied,* 541 U.S. 1017, 124 S.Ct. 2084, 158 L.Ed.2d 632 (2004) (quoting *Borchardt v. State,* 367 Md. 91, 121, 786 A.2d 631, 648–49 (2001)).

JUDGMENTS OF THE CIRCUIT COURT FOR BALTI-MORE COUNTY AFFIRMED AS TO ALL CONVICTIONS; SENTENCING VACATED; CASE REMANDED FOR A NEW SENTENCING PROCEEDING; COSTS TO BE PAID BY BALTIMORE COUNTY.

Concurring and Dissenting Opinion by WILNER, J., which CATHELL and BATTAGLIA, JJ., join.

I concur in that part of the judgment that affirms the convictions and vacates the sentence imposed on the extortion conviction but, with respect, I dissent from the Court's vacation of the death sentence.

Here is a case in which defense counsel and the State agreed on the appropriate advice to be given to the defendant, to make certain that, if he chose to waive sentencing by a jury and allow the court to determine the sentence, his waiver and election would be knowing and voluntary. The court agreed with the written statement presented by the prosecutor, with the consent of defense counsel, and read that statement as approved by them. After reading the statement, the court asked the defendant if he had any questions, to which the defendant responded that he did not. The court inquired whether the defendant had discussed his election with his attorney, and the defendant replied that he had. The court inquired whether the defendant understood what the court had recited, and, again, the defendant replied in the affirmative. The court inquired whether defense counsel, who was presumably aware that his client had been prescribed anti-psychotic medication, had any questions, and the answer was "no."

Notwithstanding the careful, fully adequate, and agreed upon, recitation, this Court declares Abeokuto's waiver of jury sentencing invalid because the trial court failed to determine whether the defendant, who had been prescribed Geodon while incarcerated at the County Detention Center, was in fact taking that medication at the time of the waiver. I find this

strained excuse to vacate a death sentence lawfully imposed more than troubling.

In his brief, Abeokuto acknowledges that, in June, 2004, two months before the waiver at issue, he had been found competent to stand trial, a ruling that he has not challenged (yet). His argument on this point is that the court was "on notice" that "his mental health was an issue" and that he "had been prescribed an anti-psychotic medication," and that "[a]ccordingly, the court was required to ask questions designed to reveal whether Mr. Abeokuto's mental illness and the drugs that he had been prescribed for that illness might have adversely affected his ability to both voluntarily *and* knowingly waive his right to be tried by a jury."

This Court seemingly rejects that argument, as presented, but from its own presumed pharmacological expertise drawn from an Internet web site, the Court finds that Geodon "may give rise to the side effects, among others, of sedation, nausea, dizziness, and confusion," and on that basis declares the waiver/election invalid. There is, of course, nothing—absolutely nothing—in the record to indicate that Abeokuto was experiencing any sedation, nausea, dizziness, or confusion when he made his election. Abeokuto made no such complaint, nor did his attorney. Nor does the transcript reveal any colloquy from which any possible sedation, nausea, dizziness, or confusion may be inferred. Simply from the fact that a drug that was prescribed for Abeokuto nearly two years earlier *may*, according to the Internet, have those effects, the Court requires—not in every case, but just in this one—that the judge make some inquiry.

What kind of inquiry? It does not appear that the trial judge had the same pharmacological expertise regarding Geodon that the Majority of this Court has assumed for itself. Was he required to consult the Internet to determine the possible side effects of every drug that Abeokuto had taken in the recent or distant past? In the absence of any suggestion by Abeokuto or his attorney that there was a problem in this regard, was the judge obliged to summon into court a pharma-

cist, or psychiatrist, or Court of Appeals judge to testify as to the possible side effects of any such drugs? Was he obliged to deny the election in the absence of such expert testimony and require Abeokuto to proceed before a jury even though he chose not to do so?

What if the judge had made an inquiry and learned that Abeokuto was actually taking Geodon—what then? In the absence of any suggestion that Abeokuto was, in fact, sedated, nauseous, dizzy, or confused—which, to this day Abeokuto has not contended—would he have been obliged to deny the waiver? Would he have been required to conduct an evidentiary hearing, with experts opining as to the alternative effects of taking or not taking the medication in various dosages? If, as argued, the medication is designed to counteract the effects of a psychosis, of hallucinations, would the judge have nonetheless been obliged to insist that Abeokuto stop taking the medication so that he could make his election while not sedated, dizzy, confused, or nauseous but simply hallucinating?

The Court's decision in this case is inconsistent with the approach taken in *Thanos v. State,* 330 Md. 77, 622 A.2d 727 (1993) and *Baker v. State,* 367 Md. 648, 790 A.2d 629 (2002) and, despite the Court's attempt to cabin it, will make routine sentencing proceedings exponentially more complex. We can take judicial notice of our own statistics that fewer than 5% of the criminal cases in the Circuit Courts of this State are resolved by jury trial. In more than 95% of the cases, the defendant waives a jury trial, and, in most of those cases, accepts a plea agreement and waives trial altogether. We know that many, probably most, of those defendants have some kind of drug history—illegal or prescription drugs. Are we now going to require, as a condition to finding a waiver to be valid, an inquiry into the defendant's past and current drug use, to determine whether there are any current side effects that might affect the knowingness or voluntariness of the waiver? Such an inquiry is certainly appropriate, and judges often *do* inquire whether a defendant is on any medication, but is it required when there is no indication that the defendant is

suffering from any effect of a drug? If not, why not? What is different about this case?

I would certainly agree that, if there was anything in the record even to suggest that Abeokuto was suffering from any drug-related (or non-drug-related) inability to make a knowing and intelligent decision, the judge would have been required to conduct a reasonable inquiry into the matter. There is nothing in this record to suggest such a problem, however, and this Court should not invalidate a perfectly good waiver by conjuring such a hypothesis out of thin air or its own imaginings.

Judges CATHELL and BATTAGLIA authorize me to state that he joins in this concurring and dissenting opinion.

Concurring and Dissenting Opinion by BELL, C.J., which GREENE, J. joins.

It is well settled that a defendant may waive the right, personal to, and exercisable only by, him or her, *Smith v. State*, 375 Md. 365, 379–81, 825 A.2d 1055, 1064 (2003), *Howell v. State*, 87 Md.App. 57, 77, 589 A.2d 90, 100 (1991), to trial by jury, but that any such waiver is effective and valid only if made on the record in open court and found by the court to have been made "knowingly and voluntarily." Maryland Rule 4–246(b);[1] *Smith*, 375 Md. at 378–81, 825 A.2d at 1063–1064; *State v. Bell*, 351 Md. 709, 724–25, 720 A.2d 311, 319 (1998); *Stewart v. State*, 319 Md. 81, 90, 570 A.2d 1229, 1233–34 (1990); *Martinez v. State*, 309 Md. 124, 131–35, 522 A.2d 950, 953–56 (1987); *Tibbs v. State*, 323 Md. 28, 31–32, 590 A.2d 550, 551–552 (1991). This determination is fact and circumstance specific, *Tibbs*, 323 Md. at 31, 590 A.2d at 551, *citing State v. Hall*, 321 Md. 178, 182, 582 A.2d 507, 509 (1990); *Stewart*, 319

---

1. Maryland Rule 4–246(b) provides:

 *"Procedure for Acceptance of Waiver.* A defendant may waive the right to a trial by jury at any time before the commencement of trial. The court may not accept the waiver until it determines, after an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, that the waiver is made knowingly and voluntarily."

Md. at 90, 570 A.2d at 1233–34; *Martinez*, 309 Md. at 134, 522 A.2d at 955, and dual-faceted, requiring that the waiver be both "knowing" and "voluntary."

For a waiver to be knowing and voluntary, it must have been, for the possessor of the right, "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938). In *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747, 756 (1970), the Supreme Court elucidated: "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." (Footnote omitted). Thus, while it is true that no fixed litany need be followed in complying with Maryland Rule 4–246, "[i]t is not sufficient that an accused merely respond affirmatively to a naked inquiry, either from his lawyer or the court, that he understood that he has a right to a jury trial, that he knows 'what a jury trial is,' and waives that right 'freely and voluntarily.' " *Tibbs*, 323 Md. at 32, 590 A.2d at 551. On the contrary, our case law is clear:

> "[T]he trial court must satisfy itself that the waiver is not a product of duress or coercion, and further that the defendant has some knowledge of the jury trial right before being allowed to waive it."

*Id.* at 31, 590 A.2d at 551, *citing Hall*, 321 Md. at 182–83, 582 A.2d at 509. *See Martinez*, 309 Md. at 134, 522 A.2d at 955, in which this Court instructed:

> "In determining whether the defendant has knowingly and voluntarily waived his right to a jury trial, the questioner need not recite any fixed incantation. Whether there is an intelligent, competent waiver must depend on the unique facts and circumstances of each case.... However, the court must be concerned that the waiver is not a product of duress or coercion.... *Adams [v. United States ex rel. McCann]*, 317 U.S. [269,] 275, 280, 63 S.Ct. [236,] 240, 242, 87 L.Ed. 268[, 272, 275, (1942) ].... Furthermore, a defen-

dant must have some knowledge of the jury trial right before he is allowed to waive it. *See Dortch [v. State]*, 290 Md. [229,] 232, 428 A.2d [1220,] 1222[ (1981) ]; *Harris v. State*, 295 Md. 329, 339 n. 1, 455 A.2d 979, 984 n. 1 (1983); *Adams*, 317 U.S. at 280, 63 S.Ct. at 242, 87 L.Ed. 268." (Footnotes and some citations omitted). *See Bell*, 351 Md. at 725, 720 A.2d at 319.

Although questioned concerning his right to a jury trial, the nature of that right, including the composition of the jury and the burden of proof, and the effect of a waiver of a jury trial for the guilt or innocence stage of the trial on the right to jury sentencing, the petitioner was not questioned with respect to the voluntariness of the election; he was not asked if the decision was freely and voluntarily made or was the product of promises, intimidation or coercion. Nevertheless, the majority concludes that, "considering the totality of the circumstances," 391 Md. 289, 320, 893 A.2d 1018, 1036 (2006), from that record, the trial court could have found, as it did, that the petitioner's waiver of trial by jury was knowing and voluntary. *Id.* In addition to emphasizing the number of times that the petitioner was asked about his jury trial right and the jury trial process, *id.* at 320, 893 A.2d at 1036, it relies on *Dortch v. State*, 290 Md. 229, 428 A.2d 1220 (1981), and *State v. Hall*, 321 Md. 178, 582 A.2d 507, in both of which the Court repeated that there is no fixed litany for jury trial waivers and, on a totality of the circumstances review, excused the trial court's failure to inquire as to whether the defendants in those cases had been subjected to physical or mental duress or coercion, *Dortch*, 290 Md. at 235, 428 A.2d at 1224; *Hall*, 321 Md. at 183, 582 A.2d at 510, or been made promises, which induced the waiver, *Dortch*, 290 Md. at 235, 428 A.2d at 1224. *Id.* at 318, 893 A.2d at 1034–35. The majority is also persuaded by the facts that "Appellant was represent by counsel, who, prior to the 16 August 2004 hearing, had discussed with appellant the decision whether to elect a court or a jury trial," *id.* at 320, 893 A.2d at 1036, that "Appellant affirmed that he wanted a court trial," *id.*, and that "[n]o facts from the record demonstrate that the court had reason to ask Appellant

whether he had been coerced or threatened to waive his right to a jury trial or whether anyone, including defense counsel or the prosecutor, promised Appellant anything in exchange for his waiver." *Id.*

In both *Hall* and *Dortch,* the defendant was undeniably informed of the nature of the jury trial right and, so, there was no issue as to his having met the "knowledge" prong of the test. *Hall,* 321 Md. at 183, 582 A.2d at 509, *Dortch,* 290 Md. at 235, 428 A.2d at 1224. Neither defendant was questioned concerning whether he had been coerced or whether he had been made promises which prompted his waiver. *Hall,* 321 Md. at 183, 582 A.2d at 509, *Dortch,* 290 Md. at 235, 428 A.2d at 1224. To be sure, the argument was made in each of those cases, as I am doing here, that the failure of the court or counsel to inquire specifically with respect to the voluntariness of the defendant's waiver of jury trial prevented it from being able to determine, as the rule requires, that the waiver was not only knowing, but voluntary, as well.

In rejecting the argument, the *Dortch* Court appears to have conflated the two prongs of the waiver test. After noting that the predecessor to Rule 4–246(b), Rule 735 d, did not require a specific inquiry into voluntariness and did not contemplate a fixed litany or specific ritual, it concluded that "the failure of the trial judge to specifically inquire as to whether the jury trial waivers were induced by promises or by physical or mental coercion did not constitute error." 290 Md. at 235, 428 A.2d at 1224. The Court explained:

"The record in the Dortch case [2] indicates that the defendant made a written election witnessed by counsel, stating that his election for a court rather than a jury trial was 'knowingly and voluntarily' made. The voluntary character of the election was fortified by the colloquy between the

---

**2.** There were two cases addressed in the one opinion. In the other case, *Cohen v. State,* the Court stated, simply, "the trial judge specifically determined on the record from his dialogue with Cohen prior to trial that he voluntarily waived his right to a jury trial." *Dortch v. State,* 290 Md. 229, 235, 428 A.2d 1220, 1224 (1981). This explanation can only be described as conclusory.

trial judge and Dortch at the commencement of the trial. We think the trial judge fairly determined that Dortch, having been fully advised with respect to the nature of a jury trial, voluntarily relinquished that right when he elected a court trial."

*Id.* at 235, 428 A.2d at 1224. It is far from clear how full advise with respect to the nature of a jury trial, which satisfies the knowledge prong, permits a court to infer that the right also was voluntarily relinquished, but that is precisely what, and all that, the Court said.

*Hall* is to like effect. There, the Court opined:

"Considering the totality of the circumstances in the present case, *see Dortch v. State, supra,* 290 Md. at 235, 428 A.2d 1220, we think that the trial judge could fairly find that Hall intentionally relinquished his known right to a jury trial by his voluntary act in waiving that right. When Hall appeared for trial before the court, in the presence of his attorney and the prosecutor, the court advised him of his right to a jury trial 'where twelve people would hear the evidence,' all of whom would have to be convinced beyond a reasonable doubt before he could be found guilty. The court advised Hall that if he waived his right to a jury trial, the court would hear the evidence and have to be convinced beyond a reasonable doubt before he could be found guilty. At the end of this colloquy, the trial judge asked Hall whether he wanted to be tried by jury or by the court, to which Hall answered: 'Tried by the Court.'

"While the court did not specifically ask Hall whether he understood what he had been told, or whether his election of a court trial was the result of any physical or mental duress or coercion, we think that the record before us demonstrates that the court could fairly be satisfied that Hall had the requisite knowledge of the jury trial right, that the waiver was voluntary, and that the requirements of the rule were satisfied. Moreover, the court was not required to advise Hall, as he contends, as to the details of the jury selection process.

"We conclude, therefore, that constitutional due process requirements were not transgressed in this case. Fortifying this determination is the fact that on two prior occasions, the first in writing, and the second during in-court plea negotiations, Hall also waived his right to a jury trial; on each occasion, he was also represented by counsel."

*Hall,* 321 Md. at 183, 582 A.2d at 509–510.

These cases stand in stark contrast to a later case, *Tibbs,* 323 Md. 28, 590 A.2d 550, penned by the author of both *Hall* and *Dortch.* In that case, the defendant's proffered waiver of jury trial was accepted by the trial court as knowingly and voluntarily made, on the basis of a colloquy between the defendant and his counsel, occurring after the defendant responded, "Yes, I do," to counsel's inquiry concerning his knowledge of his right to have a trial by a jury:

" 'MR. STILLRICH [Defense Counsel]: And do you understand what a jury trial is?

" 'DEFENDANT: Yes, I do.

" 'MR. STILLRICH: And you indicated to me when I spoke with you at the detention center the other evening that you desired to have the case tried before this Court alone, is that correct?

" 'DEFENDANT: Yes, I do.

" 'MR. STILLRICH: And you do specifically waive your right to have the matter tried before a jury?

" 'DEFENDANT: Yes, I do.

" 'MR. STILLRICH: Has anyone forced you or threatened you to have you give up your right to a jury trial?

" 'DEFENDANT: No, they haven't. " 'MR. STILLRICH: Have you given up your right to a jury trial freely and voluntarily?

" 'DEFENDANT: Yes, I have.

\* \* \* \* \* \*

" 'MR. STILLRICH: Your Honor, I would proffer to the Court that a waiver of a jury trial is freely and voluntarily tendered.

* * * * * *

" 'THE COURT: All right.

" 'MR. STILLRICH: And we're ready to proceed, Your Honor.

" 'THE COURT: Okay. And Mr. Tibbs enters a plea of not guilty to the four counts, is that right?

" 'MR. STILLRICH: That's correct.

" 'THE COURT: Waives his right to a jury trial?

" 'MR. STILLRICH: Yes, Your Honor.' "

*Id.* at 30, 590 A.2d at 551.

In reversing the Court of Special Appeals' affirmance of the defendant's conviction, on a totality of the circumstances review, acknowledging that the validity of a jury trial waiver does not depend on a fixed litany, *id.* at 31, 590 A.2d at 551, the Court held:

> "[T]he record is woefully deficient to establish that Tibbs knowingly and voluntarily relinquished his right to a jury trial. The record fails to disclose that Tibbs received any information at all concerning the nature of a jury trial, as required by our cases. *See Hall, supra,* 321 Md. at 183, 582 A.2d 507; *Martinez v. State,* 309 Md. 124, 522 A.2d 950 (1987). It is not sufficient that an accused merely respond affirmatively to a naked inquiry, either from his lawyer or the court, that he understood that he has a right to a jury trial, that he knows 'what a jury trial is,' and waives that right 'freely and voluntarily.' "

*Id.* at 31–32, 590 A.2d at 551. We added that speculation, based on past criminal justice system involvement, could not supply the "knowledge" requirement: "[a]ccordingly, notwithstanding that Tibbs may have had some prior unspecified experience with the criminal justice system, the trial judge could not fairly be satisfied on this record that Tibbs had the requisite knowledge of the nature of the jury trial right, that

his waiver of the right was knowing and voluntary, and that the requirements of the rule were thus met." *Id.* at 32, 590 A.2d at 551–52.

The majority, in responding to the contrary result reached by the *Tibbs* court, merely states that the trial court in that case "should have inquired further." 391 Md. at 318, 893 A.2d at 1035, n. 13. I agree, it should have and the fact that it did not was fatal. Moreover, that is exactly what I believe should have happened here. If *Tibbs* stands for the proposition that knowledge of the right to jury trial cannot be inferred when the litany focuses exclusively on voluntariness factors, how, I ask, can the majority infer no coercion or inducements when the litany focuses exclusively on knowledge factors?

The circumstances in *Tibbs* mirror this case. At no time was the petitioner asked about anything that would impact the voluntariness of his waiver, except, of course, the nature of the jury trial right and the effect of waiver in the context of a death penalty proceeding. That a defendant is aware of, has some knowledge of, the jury trial right, while it may be necessary to a finding of voluntariness, it simply does not address directly the motivation issue and it certainly does not inform the court as to it. Whether a person has been coerced or induced to act, whether physically, mentally, by promise or otherwise, ordinarily is not readily, and may not be at all, observable.[3] As in *Tibbs*, there is in this case nothing whatso-

---

3. The Court was not unaware of the tenuousness of relying on a record that was not developed fully as to all aspects of the waiver construct. In *Dortch v. State*, 290 Md. 229, 428 A.2d 1220 (1981), taking note of the fact that many trial judges inquired specifically into the motivation of defendants who waived jury trials, the Court pronounced that to be the preferable practice and "encourage[d] trial judges to engage persons electing court trials in a dialogue as detailed as time, resources and circumstances permit so as to insulate jury trial waivers from successful direct or collateral attack." *Id.* at 236, 428 A.2d at 1224, quoting *Davis v. State*, 278 Md. 103, 118, 361 A.2d 113, 121 (1976). We reiterated that encouragement in *Hall*, in light of our recognition "that the cold record before us does not reflect a defendant's demeanor, tone, facial expressions, gestures, or other indicia which, to a trial judge, may

ever on which the trial court could have relied to determine, as it must have done, that the petitioner's jury trial waiver was not the product of duress or coercion. The majority's reliance on the absence of facts in the record demonstrating that the court had a reason to ask questions going to the voluntariness of the waiver is, therefore, quite curious. Nor can the fact that the petitioner was represented by counsel provide the necessary basis for the voluntariness determination.

We can not forget that coercion and improper inducements may have many sources. Indeed, it is not unheard of that a defendant's attorney may be the source of an improper inducement. To be sure, we can speculate that counsel properly advised the petitioner about his jury trial right and satisfied himself that the defendant's decision was not the result of coercion, duress or promises. Moreover, we may also surmise that counsel did not himself do anything to coerce or improperly induce the waiver. As with the knowledge prong, *see Tibbs*, that is not sufficient. Nor is it uncommon that disclosure of such inducements is made, if at all, only upon direct inquiry, perhaps because of the nature of the proceedings— the defendant is responding to questions and likely does not know that he should, or is expected to, volunteer information. Expecting the defendant to volunteer the information or, at least signal that there may be matters that may call into question the voluntariness of the defendant's announced decision, without explicitly advising him of the consequences of not doing so, therefore, is, I submit, most unrealistic. In any event, it is the court's burden to satisfy itself that the waiver is voluntary, not the defendant's. The absence of evidence hardly seems an appropriate or adequate basis on which to meet that burden.

I join the majority opinion insofar as it holds that the record is insufficient to establish that the petitioner knowingly and voluntarily waived his right to jury sentencing. I dissent, however, from the conclusion that he knowingly and voluntari-

be indicative of a knowing and voluntary waiver of the jury trial right." *Id.* at 183–84, 582 A.2d at 510.

ly waived his right to jury trial at the guilt or innocence stage. I would remand and order a new trial.

Nevertheless, I feel compelled to mention one curiosity regarding the basis for the majority's holding that the petitioner did not knowingly and voluntarily waive his right to jury sentencing—the failure of the trial judge to make an inquiry concerning the voluntariness of the petitioner's jury sentencing decision. Noting that the trial court knew that the petitioner had been prescribed psychiatric medication while in custody, the majority is troubled, and rightly so, by the trial judge's failure to ascertain whether, when he was required to decide whether to waive jury sentencing, he was still taking the medication and, if so, whether any side effects of such medication might have affected the petitioner's ability to make a knowing and voluntary waiver. Not having made this inquiry, directly implicating the voluntariness of the petitioner's waiver decision, the trial judge erred, the majority concludes, in finding the waiver to have been knowing and voluntary. Interestingly, the petitioner did not volunteer any information on the subject of his medication, or the effect of not taking it, at the sentencing waiver hearing.

It is interesting that the petitioner was not questioned on this subject, just as he did not volunteer such information, during the initial jury trial waiver either. The majority states that such an inquiry was unnecessary at that earlier stage, reasoning "[t]he effect of the failure to make a specific inquiry on this point in the jury sentencing waiver is distinguishable from the absence of a similar inquiry during the jury trial waiver process because, in the latter, the court heard contemporaneous expert medical testimony regarding Appellant's competency to stand trial, which included the prescription of [psychiatric medication] ..." 391 Md. at 349–50, 893 A.2d 1053.

This difference *is* curious. The issue of whether the petitioner's voluntariness was compromised by the petitioner's failure to take his prescribed medication was as much an issue at the jury trial waiver at the guilt or innocence stage as it was at the jury sentencing stage. I do not agree that whether

an inquiry on that subject is appropriate depends on the timing of a competency hearing. Unless the issue of the timing of the last taking of the medication literally had been explicitly addressed immediately before the waiver proceeding, there really is little difference between the two scenarios.

In any event, the focus of a hearing on a defendant's competency to stand trial is on whether that defendant has the capacity to make a voluntary waiver, whether he or she understands the proceedings, appreciates their significance, and is able to assist counsel in mounting a defense. What is encompassed in the concept of voluntariness as it relates to waiver is much more; it involves determining whether, in fact, that defendant voluntarily waived his or her right to a jury trial or sentencing, as appropriate. That determination, in turn, may be informed, and often is, by more than a defendant's capacity to waive due to lack of medication and its effect; also relevant to the determination is the presence or absence of coercion, inducements or promises affecting the waiver decision. The temporal proximity between a competency hearing and the waiver of jury trial hearing, accordingly, is not dispositive, even if relevant.

Judge GREENE joins in the views expressed herein.

RAKER, J., concurring and dissenting, in which BELL, C.J., and GREENE, J., join in dissent.

## I.

I would reverse the sentence and the imposition of the death penalty on the grounds that the Maryland death penalty statute violates due process and is therefore unconstitutional because the statute requires that aggravating circumstances outweigh mitigating circumstances only by a preponderance of the evidence rather than the standard of beyond a reasonable doubt. I adhere to my views expressed more fully in the dissenting opinions of *Evans v. State,* 389 Md. 456, 886 A.2d 562 (2005), *Miller v. State,* 380 Md. 1, 843 A.2d 803 (2004),

*Oken v. State,* 378 Md. 179, 835 A.2d 1105 (2003), and *Borchardt v. State,* 367 Md. 91, 786 A.2d 631 (2001).

I would sever the preponderance of the evidence standard from Md.Code (2002, 2005 Cum.Supp.), § 2–303(i) of the Criminal Law Article, vacate appellant's death sentence, and remand the case for a new capital sentencing proceeding at which a reasonable doubt standard would apply to the weighing process under § 2–303(i). Although I find that the preponderance of the evidence standard in § 2–303(i) is invalid, that standard clearly is severable from the remainder of the Maryland death penalty statute. The Maryland death penalty statute is complete and capable of being enforced with the preponderance of the evidence standard severed from § 2–303(i). That standard would, under the requirements of due process, be replaced by the standard of beyond a reasonable doubt.

Chief Judge Bell and Judge Greene have authorized me to state that they join in this dissent.

## II.

I would affirm the judgments of conviction on the guilt/innocence phase.